# United States Court of Appeals

## For the First Circuit

No. 07-2585

DANIEL YEBOAH-SEFAH,
a/k/a HENRY K. BOATENG,

Petitioner, Appellant,

v.

EDWARD FICCO,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Torruella, Selya, Circuit Judges,
and Domínguez,* District Judge.

Chauncey B. Wood, with whom Wood & Nathanson, LLP, was on
brief for appellant.
David T. Huang, Assistant Attorney General, Criminal Division,
with whom Martha Coakley, Attorney General, was on brief for
appellee.

February 19, 2009

---

* Of the District of Puerto Rico, sitting by designation.

**TORRUELLA**, <u>Circuit Judge</u>. Petitioner, Daniel Yeboah-Sefah, a/k/a Henry K. Boateng,[1] is a state prisoner convicted in Massachusetts of charges stemming from the murder of his five-week old son and the severe beating of his former girlfriend. He was sentenced to life imprisonment. His primary defense at trial was that he was not guilty by reason of insanity.

Petitioner's present appeal challenges the district court's denial of his federal petition for habeas corpus relief. Among the issues raised on habeas, petitioner argues that (1) he did not make a "knowing, intelligent and voluntary waiver" of his constitutional right to "conflict-free counsel"; (2) he was deprived of effective assistance of counsel; and (3) he was deprived of due process by the trial court's failure to hold competency and voluntariness hearings <u>sua</u> <u>sponte</u>. After careful consideration, we affirm the denial of habeas corpus relief by the district court.

## I. **Background**

### A. **Facts**

We take the facts largely as recounted by the Massachusetts Supreme Judicial Court ("SJC") decision affirming Yeboah-Sefah's conviction, "supplemented with other record facts

---

[1] Petitioner was known at the time of his conviction as "Henry K. Boateng." He has since legally changed his name to "Daniel Yeboah-Sefah," the name under which he filed the instant habeas petition. We will hereinafter refer to petitioner as "Yeboah-Sefah."

consistent with the SJC's findings."  Healy v. Spencer, 453 F.3d 21, 22 (1st Cir. 2006).

Yeboah-Sefah and Alecia Moore ("Moore") met in Worcester, Massachusetts in June of 1991 and began to date.  In January 1992, Yeboah-Sefah began attending the University of Massachusetts at Amherst, but soon dropped out.  Yeboah-Sefah then discovered that Moore was pregnant with his child.  In the fall of 1992, Yeboah-Sefah moved in with Moore and a week later their son, Jameel, was born.

As a condition for Yeboah-Sefah moving in with her, Moore asked that he either return to school or find a job.  Yeboah-Sefah failed to do so and on October 24, 1992, Moore initiated a conversation with him during which she told him that he would have to move out.  This discussion took place in Yeboah-Sefah's bedroom, down the hall from where Moore and the baby slept.  The discussion continued into the morning of October 25th.

When Moore got up to leave the room, Yeboah-Sefah sprang up, threw her to the floor, and yelled "I'm going to kill you" as he strangled, hit and kicked her.  The attack on Moore lasted about two hours, and included the use of a stick.  At some point during the assault, Yeboah-Sefah announced "I'm going to get the baby." He then retrieved five-week old Jameel from his crib, threw him on the floor, and began to kick and strangle him.  When Moore tried to intervene, Yeboah-Sefah kicked her in the face.  Yeboah-Sefah

-3-

eventually took the baby and put him back in his crib. Jameel died from his injuries.

Moore managed to crawl back to her room and lie down on the bed. Yeboah-Sefah entered and held a knife over Jameel, and then over Moore. Eventually Moore's mother, Enid Hall ("Hall"), called, and Yeboah-Sefah answered the phone. Yeboah-Sefah told Hall that Moore was out doing laundry. He then hung up and ripped the telephone cord out of the wall. As Moore had just been to her house the day before to do laundry, Hall's suspicion were aroused so she and Moore's sister drove to Moore's apartment to investigate. When no one answered the door, they contacted the police. Moore's mother and sister also yelled for Moore from outside the apartment. Upon hearing them, Yeboah-Sefah became disconsolate and went into the bathroom where he drank from a container of bleach, saying he would not go to jail. He prevented Moore from going downstairs to reach her mother and sister.

The police soon arrived. Moore was taken to a hospital while a detective read Yeboah-Sefah the Miranda warnings and questioned him about what had happened. Based on the testimony of the officer at trial, Yeboah-Sefah responded that he and Moore had gotten into a fight, and that he had beaten her with his fists and knees. When asked about what happened to the baby, he admitted to hitting Jameel's head on the bedroom wall and kicking him.

-4-

Yeboah-Sefah never denied killing Jameel or assaulting Moore. His principal defense at trial was an insanity defense; that he lacked criminal responsibility for his actions on account of mental illness. Yeboah-Sefah presented testimony that, since 1988, he had been receiving treatment for a major psychiatric disorder, diagnosed as depression with psychotic features and the possibility of schizophrenia, and that he had been prescribed and been taking various antidepressant and anti-psychotic medications. A psychiatrist, Dr. David Rosemarin, was called as a defense witness. Dr. Rosemarin testified that on the day of the crimes Yeboah-Sefah was likely in the grip of psychosis, feeling under the control of a spirit and hearing voices mocking him and telling him to kill himself. Dr. Rosemarin related that Yeboah-Sefah had told him that after assaulting Moore, but before attacking Jameel, he had responded to these voices by mixing all of his medications and taking them in one dose. While Dr. Rosemarin could come to no conclusion regarding Yeboah-Sefah's state of mind during his attack on Moore, he opined that Yeboah-Sefah had suffered a hallucination causing him to believe that Jameel was some sort of evil creature or cat who would kill him if he did not kill it first. It was Dr. Rosemarin's further opinion that Yeboah-Sefah was not criminally

responsible for the killing of the child within the meaning of Massachusetts law.[2]

The Commonwealth called its own expert, Dr. Marc Whaley, a psychologist who acknowledged that Yeboah-Sefah suffered from mental illness and that anti-psychotic drugs had helped him function. However, Dr. Whaley opined that Yeboah-Sefah's actions on the day in question displayed a rationality that belied any claim of actual insanity and, on that basis, concluded that Yeboah-Sefah had sufficient mental capacity to be criminally responsible for his actions on that date of his crimes. Dr. Whaley further concluded that Yeboah-Sefah's mental illness impaired his capacity to "premeditate" his actions. The Commonwealth also called a medical examiner, Dr. Stanton Kessler. Dr. Kessler, who had performed the autopsy on Jameel, testified about the decedent's injuries and concluded that the cause of death was multiple blunt traumatic injuries.

The case was submitted to the jury on two theories of murder in the first degree: premeditation and "extreme atrocity or cruelty." The jury convicted Yeboah-Sefah of the murder of Jameel with "extreme atrocity or cruelty," but not murder with deliberate premeditation. For the attack on Moore, Yeboah-Sefah was convicted

---

[2] See Commonwealth v. McHoul, 226 N.E.2d 556, 557-558 (Mass. 1967) (holding that criminal responsibility requires that a person have the substantial capacity to appreciate the wrongfulness of his acts and to conform his conduct to the requirements of the law).

-6-

of armed assault with intent to murder, assault and battery by means of a dangerous weapon, assault by means of a dangerous weapon and assault and battery. He was sentenced to life imprisonment.

## B. Procedural History

Yeboah-Sefah appealed his conviction and subsequently filed a motion for a new trial, premised, among other things, on the ineffective assistance of his trial counsel, Mr. John LaChance ("LaChance"). The appeal was stayed pending the outcome of the motion. The motion judge, who was not the trial judge, conducted an evidentiary hearing at which Yeboah-Sefah's new counsel called three new expert witnesses, including two other psychologists and a medical examiner. Yeboah-Sefah claimed that these witnesses, if they had been called to testify at trial, would have presented a stronger case for insanity, and that trial counsel's failure to call them was manifestly unreasonable, constituting ineffective assistance. Yeboah-Sefah's trial counsel also testified and explained his trial tactics and strategy. The motion for a new trial was denied. See Commonwealth v. Boateng, No. 92-0656, 2000 WL 1481424 (Mass. Super. Ct. Sept. 19, 2000).

Yeboah-Sefah timely appealed the denial of his new trial motion, which the SJC consolidated with the direct appeal of his convictions. On January 21, 2003, the SJC issued a decision affirming both the murder conviction and the denial of the new

-7-

trial motion.  Commonwealth v. Boateng, 781 N.E.2d 1207 (Mass. 2003).[3]

On January 20, 2004, petitioner filed the instant habeas corpus petition with the United States District Court for the District of Massachusetts.  The petition was followed by a motion, which was granted, to stay federal proceedings until petitioner had exhausted state avenues of relief.  Petitioner then filed a second motion for new trial in the Massachusetts Superior Court.  On March 25, 2005, an addendum to the motion was filed, along with motions for an evidentiary hearing and funds to hire a psychiatric expert.  Following a non-evidentiary hearing before a new judge, the second new trial motion was also denied.  Commonwealth v. Boateng, No. WO Cr. 1992-00656 (Mass. Super. Ct. Dec. 16, 2005). Petitioner then appealed this denial to the SJC, where on May 5, 2006, pursuant to Mass. Gen. Laws ch. 278, § 33E, a single justice issued a memorandum and order denying the petition for appellate review on the ground that it did not raise a "new or substantial" issue for the Court.  Commonwealth v. Boateng, No. SJ-2006-0021 (SJC Memorandum, Cowin, J., May 5, 2006).

Yeboah-Sefah thereupon returned to the federal court where the district court denied his habeas claims on September 13, 2007.  Yeboah-Sefah v. Ficco, No. 04-10125-RWZ, 2007 WL 2713392 (D.

---

[3]  The SJC did vacate Boateng's conviction for armed assault with intent to murder based on an erroneous jury instruction.  Boateng, 781 N.E.2d at 1223.

-8-

Mass. Sept. 13, 2007).  Petitioner has timely appealed this denial and the district court has granted a certificate of appealability as to all issues.

## II. Discussion

### A.  Applicable Law

#### 1.  Standard of Review

"We review the district court's denial of habeas relief de novo."  Lynch v. Ficco, 438 F.3d 35, 44 (1st Cir. 2006) (citing Ellsworth v. Warden, 333 F.3d 1, 3 (1st Cir. 2003)).  "Put differently, the district court opinion, while helpful for its reasoning, is entitled to no deference."  Healy, 453 F.3d at 25.

Our review of a federal claim on habeas is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Under AEDPA, where a federal claim was "adjudicated on the merits in State court proceedings," the application for habeas corpus must be denied unless the state court's adjudication of the claim satisfies either of two conditions: (1) it "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States," or (2) it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

For purposes of section 2254(d)(1), "clearly established Federal law" refers only to "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions at the time of the relevant state court decision." Carey v. Musladin, 549 U.S. 70, 74 (2006) (quoting Williams v. Taylor, 529 U.S. 362, 412 (2000))(emphasis added).

> An "unreasonable application" of federal law occurs when the state court identifies the correct legal principle, "but (i) applies those principles to the facts of the case in an objectively unreasonable manner; (ii) unreasonably extends clearly established legal principles to a new context where they should not apply; or (iii) unreasonably refuses to extend clearly established legal principles to a new context where they should apply."

Malone v. Clarke, 536 F.3d 54, 63 (1st Cir. 2008) (quoting Sleeper v. Spencer, 510 F.3d 32, 38 (1st Cir. 2007)). A decision can still be "reasonable" even if the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly," rather, "unreasonable" here means something more than incorrect or erroneous. Williams, 529 U.S. at 411. Moreover, even if a state court's error rises to the level of being "unreasonable," habeas relief is nevertheless unavailable unless petitioner can show that the error had a "substantial and injurious effect or influence in determining the jury's verdict." Delany v. Bartee, 522 F.3d 100, 105 (1st Cir. 2008) (quoting Brecht v. Abrahamson, 507 U.S. 619, 631 (1993)).

A matter is "adjudicated on the merits," giving rise to deference under § 2254(d) of AEDPA, "if there is a 'decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground.'" Teti v. Bender, 507 F.3d 50, 56-57 (1st Cir. 2007) (quoting Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001)). However, where petitioner raises a federal claim during state proceedings that is not decided by the state court, this court reviews that claim de novo. Horton v. Allen, 370 F.3d 75, 80 (1st Cir. 2004). After all, "we can hardly defer to the state court on an issue that the state court did not address." Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir. 2001).

"AEDPA [also] sets out a separate and exacting standard applicable to review of a state court's factual findings." Pike v. Guarino, 492 F.3d 61, 68 (1st Cir. 2007). The state court's factual finding are "presumed to be correct" unless the petitioner rebuts this "presumption of correctness" with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### 2. Procedural Default

The "independent and adequate state ground doctrine" is also relevant to the claims and defenses before us. This doctrine "applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner has failed to meet a state procedure requirement." Coleman v. Thompson, 501

-11-

U.S. 722, 730-31 (1991). Thus, where a claim was procedurally defaulted by the petitioner in state court, we are barred from reaching the merits of the claim unless the petitioner meets the federal habeas standard for excusing the procedural waiver. See id. at 750 ("In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless [the default is excused]."). A procedural waiver can be excused if "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or . . . a fundamental miscarriage of justice." Id.

### B. Waiver of Right to Conflict-Free Counsel

In his first claim, petitioner asserts that his Sixth Amendment right to counsel was violated because he was represented at trial by counsel who had a conflict of interest that petitioner did not knowingly, intelligently and voluntarily waive. The alleged conflict involves trial counsel's simultaneous representation of a prosecution witness, the medical examiner, Dr. Kessler, in an unrelated civil matter. Although all parties were on notice of the conflict prior to the commencement of trial, and the trial judge conducted an inquiry of the petitioner and obtained petitioner's consent before permitting the representation to

continue,[4] petitioner argues that because his consent was not knowing, intelligent and voluntary, as required to establish an

---

[4] As set forth in the record, the inquiry proceeded as follows:

**THE COURT:** Yes Mr. Boateng, we are talking about [the medical examiner] Dr. Kessler and the fact that your lawyer represents him in a civil matter. Now he says that he talked to you about that a couple of times.
**DEFENDANT:** Yes, Your Honor.
**THE COURT:** And that from the nature of this case, in the way in which this case is going to be tried, that his understanding of your position is the fact that he is representing him in this civil matter, and that represents, in a technical sense, a conflict of interest, that your position is that you have no objection to his representing you and having to question Dr. Kessler in your behalf and the like, all of those questions that surround that subject. Is that so?
**DEFENDANT:** Yes, Your Honor.
**THE COURT:** All right. Thank you.
.....
**THE COURT:** I would just say this to you: – you can stay where you are, Mr. Boateng - that you are always a little bit concerned about situations where there is a conflict of interest, because you can't always reach out and deal with situations when you don't anticipate them, when they happen in the course of a trial. Sometimes, for example, a witness says something which you didn't know about ahead of time, and its necessary for the lawyer to take a rather forceful position with the witness, for example, really cross-examine that witness. So that when you deal with the situation in advance, like we are here, and you say that you are agreeable to this lawyer, under these circumstances acting as your lawyer, you have to accept with that the fact that it's conceivable something could happen while Kessler was testifying that made his position, Kessler, and your position, somewhat antagonistic. Do you understand that?
**DEFENDANT:** Yes, Your Honor.
**THE COURT:** And you are agreeable to that?
**DEFENDANT:** Yes Your Honor.
**THE COURT:** Nevertheless, right?
**DEFENDANT:** Yes, Your Honor.

-13-

effective waiver, the trial court violated his constitutional rights in permitting the representation to go forward. He challenges the validity of his waiver on two grounds, namely: (1) that a combination of circumstances, including his mental illness, the medications he was taking, discovering the conflict only upon the eve of trial, and having not been provided the opportunity to consult with conflict-free counsel in making the decision, rendered his waiver involuntary; and (2) that the trial judge's colloquy, which failed to produce a narrative response[5] from him, was inadequate as a matter of law to establish voluntariness.

The SJC heard this claim and rejected it on the merits, finding that petitioner's waiver of the conflict was knowing and intelligent, and that Yeboah-Sefah was not deprived of any constitutional rights as a result of its acceptance:

> On learning of the dual representation, the trial judge conducted an inquiry of [petitioner] to determine whether his decision to continue with his trial counsel was intelligently made. The judge asked [petitioner] several questions in regard to the potential conflict, and received assurances that he found to be informed and adequate. While the colloquy . . . did not elicit the type of narrative responses for which we expressed preference . . . this does not mean it was inadequate. We are satisfied that any deficiency in the colloquy as it

---

[5]   In objecting to the absence of a "narrative response," petitioner seems to suggest that the judge should have elicited an explicit statement from petitioner, in so many words, that he has been advised of his rights, understands his attorney's conflict of interest and voluntarily waives his Sixth Amendment protections.

> appears in the transcript was due less to the
> diligence of the judge in ensuring that the
> decision was knowing and voluntary than to the
> reticence of the defendant. [Petitioner]
> knowingly and voluntarily assented to the dual
> representation.

Boateng, 781 N.E.2d at 1217 (citations and footnote omitted).

Petitioner's claim regarding the validity of his waiver of the right to conflict-free counsel was heard and adjudicated on the merits by the SJC.[6]  Therefore, our review of that decision is subject to the deferential AEDPA standard.  28 U.S.C. § 2254(d). As the question of whether the petitioner made a knowing, intelligent and voluntary waiver of his right to counsel in state court is a "mixed question of law and fact" we review it under § 2254(d)(1)'s "unreasonable application" clause.  See Williams, 529 U.S. at 409.  Applying this standard, we hold that the SJC's decision -- that the trial court's colloquy was adequate to establish petitioner's knowing and voluntary waiver of his right to conflict-free counsel -- did not involve "an unreasonable

---

[6]  The Commonwealth parses the petitioner's argument and asserts that the first portion of the argument, that a combination of circumstances surrounding petitioner's waiver rendered it involuntary, was procedurally defaulted because it was untimely raised in the course of state proceedings, and therefore, we are precluded from even reaching it on habeas.  See Walker v. Russo, 506 F.3d 19, 21 (1st Cir. 2007) ("Normally, the fact that a claim is procedurally defaulted in state court is an adequate and independent state ground precluding federal habeas relief"). However, petitioner responds that the Commonwealth has waived its procedural default argument by failing to raise it before the district court.  See Pike, 492 F.3d at 72-73.  In any event, because we easily reject petitioner's claim on the merits, we need not resolve this dispute.

-15-

application" of "clearly established Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).

Under clearly established federal law as determined by the Supreme Court, petitioner has a Sixth Amendment right to the effective assistance of counsel that includes "a correlative right to representation that is free from conflicts of interest." Wood v. Georgia, 450 U.S. 261, 271 (1981).  "Even where an actual conflict exists," however, a defendant "may waive this conflict . . . and elect to have the attorney continue representation, so long as that waiver is knowing, intelligent, and voluntary." United States v. Ross, 33 F.3d 1507, 1524 (11th Cir. 1994); see also Brady v. United States, 397 U.S. 742, 748 (1970) ("[W]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.").

The Supreme Court has held that the trial judge bears the "serious and weighty responsibility . . . of determining whether there is an intelligent and competent waiver by the accused," and "must investigate as long and as thoroughly as the circumstances of the case before him demand" before accepting the waiver. Schneckloth v. Bustamonte, 412 U.S. 218, 244 & n.32 (1973) (citing Von Moltke v. Gillies, 332 U.S. 708, 723-24 (1948)).  However, this obligation is generally and broadly stated, and there are no clearly established Supreme Court decisions bearing directly on the

constitutional requirements for an adequate conflict-waiver colloquy. See 21A Am. Jur. 2d. Criminal Law § 1153 (2008) ("no particular cautionary instruction or form [by court] is required to ensure the validity of [defendant's] waiver" of right to counsel). Rather, the Supreme Court offers only general guidance as to the requirements for a voluntary waiver. See, e.g., Edwards v. Arizona, 451 U.S. 477, 488 (1981) ("the determination of whether there has been an intelligent waiver of right to counsel must depend . . . upon the particular circumstances surrounding the case, including the background, experience, and conduct of the accused" (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938))).

Applying these general federal guidelines to the factual determinations made by the Massachusetts court, we cannot conclude that the SJC's decision that petitioner made a knowing and intelligent waiver of his right to conflict-free counsel involved an "unreasonable application" of federal law. Nor did the decision involve an unreasonable determination of the facts in light of the evidence. The SJC found that defense counsel discussed the matter with the petitioner and the medical examiner prior to trial, and all believed that the parallel representation in the civil case did not create a conflict of interest. It also determined that on learning of the dual representation the trial judge conducted an inquiry of the petitioner to ensure that petitioner's decision to

continue with his current trial counsel, despite the dual representation, was intelligently and voluntarily made.

The judge's colloquy was conducted after petitioner had been found competent to stand trial, and thus presumably capable of making an intelligent decision to waive his rights. See Godinez v. Moran, 509 U.S. 389, 399-400 (1993) (holding that the standard of competency for waiving the right to counsel is the same as the competency standard for standing trial).  Moreover, the judge's colloquy can reasonably be considered a thorough investigation sufficient to render petitioner's waiver "knowing and voluntary" as well, in that the trial judge made sure that petitioner was aware of the potential conflict, directed petitioner's attention to the possible negative implications of the dual representation, and obtained the petitioner's verbal assent that he nevertheless wanted his trial counsel to continue to represent him.  See id. at 401 n.12 (distinguishing "competency" inquiry as relevant to whether defendant has ability to understand, from "knowing and voluntary" inquiry, designed to determine whether defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced).  The inquiry did not elicit the type of narrative responsive for which some lower federal courts have expressed a preference.  See, e.g., United States v. García, 517 F.2d 272, 278 (5th Cir. 1975), abrogated on other grounds by Flanagan v. United States, 465 U.S. 259 (1984);

-18-

but see, United States v. Hernández-Lebrón, 23 F.3d 600, 605 (1st Cir. 1994) (finding adequate inquiry into waiver of conflict where defendant answered "yes" to judge's inquiries, noting that "[w]e do not require that defendants make narrative responses"). Nevertheless, as in Hernández-Lebrón, petitioner did clearly answer in the affirmative, stating "Yes, Your Honor," to each of the judge's questions. In any event, no Supreme Court precedent has explicitly imposed a "narrative response" requirement, and thus, such cannot constitute "clearly established law" for purposes of § 2254(d)(1).

Based on these facts, both the motion judge who considered petitioner's new trial motion, as well as the SJC, concluded that petitioner made a knowing and intelligent waiver of the conflict. Given the generalized nature of the Supreme Court's guidance on the subject, we are unable to conclude that the SJC "unreasonabl[y] appli[ed] clearly established Federal law." Carey, 549 U.S. at 77; see also Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) (noting that "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

## C.  Ineffective Assistance of Counsel

The Sixth and Fourteenth Amendments to the United States Constitution afford a defendant the right to the effective assistance of counsel in all state criminal prosecutions which may result in the loss of his liberty. Strickland v. Washington, 466

-19-

U.S. 668, 684 (1984). However, to establish constitutionally ineffective assistance of counsel as a ground for federal habeas relief, the petitioner bears a doubly heavy burden.

First, petitioner must satisfy the two-prong Strickland standard for establishing constitutionally ineffective assistance of counsel -- namely, "(1) deficient performance by counsel (2) resulting in prejudice." Malone, 536 F.3d at 63 (citing Rompilla v. Beard, 545 U.S. 374, 380 (2005)). "To establish that counsel's performance was deficient, a defendant must show that it fell below an objective standard of reasonableness under the circumstances." Sleeper, 510 F.3d at 38 (citing Strickland, 466 U.S. at 687-88). "[J]udicial scrutiny of counsel's performance must be highly deferential," and "a reviewing court must not lean too heavily on hindsight: a lawyer's acts and omissions must be judged on the basis of what he knew, or should have known, at the time his tactical choices were made and implemented." Ouber v. Guarino, 293 F.3d 19, 25 (1st Cir. 2002) (citing Bell v. Cone, 535 U.S. 685 (2002)). To establish that the deficiency was prejudicial, defendant must show "that, but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have been different." Sleeper, 510 F.3d at 39 (citing Wiggins v. Smith, 539 U.S. 510, 537 (2003)). In other words, prejudice requires "a reasonable probability that, absent the

errors, the factfinder would have had a reasonable doubt respecting guilt." Strickland, 466 U.S. at 695.

Second, where the petitioner's claim was adjudicated on the merits by the state court, as most of Yeboah-Sefah's ineffective assistance claims were, petitioner must also satisfy the AEDPA standard.[7]  Since an ineffective assistance of counsel claim is a mixed question of law and fact, Strickland, 466 U.S. at 698, it is evaluated under the "unreasonable application" clause of § 2254(d).  Williams, 529 U.S. at 409 (mixed questions are reviewed under § 2254(d)(1)'s "unreasonable application" clause). Therefore, in order to prevail, petitioner must demonstrate that the state court's resolution of his ineffective assistance of counsel claim resulted in a decision that involved an "unreasonable application of clearly established Federal law."  28 U.S.C. § 2254 (d)(1).  Because petitioner does not argue that the state court extended or refused to extend Strickland to a new context, our

---

[7]  Petitioner argues that his federal ineffective assistance claim was not adjudicated on the merits by the SJC because the SJC did not address the claim under the two-prong Strickland standard. However, the SJC reviewed petitioner's ineffective assistance of counsel claim by asking "whether there was an error in the course of the trial (by defense counsel . . . ) and, if there was, whether that error was likely to have influenced the jury's conclusion." Boateng, 781 N.E.2d at 1216 (quoting Commonwealth v. Wright, 584 N.E.2d 621 (Mass. 1992)).  "Because this court has previously determined that [the Wright] standard . . . is at least as protective of defendants as the federal ineffective assistance of counsel standard, see Horton v. Allen, 370 F.3d 75, 86 (1st Cir. 2004). . . 'we will presume the federal law adjudication to be subsumed within the state law adjudication.'" Sleeper, 510 F.3d at 39 (quoting Teti, 507 F.3d at 56).

ultimate inquiry, where the claim was "adjudicated on the merits," is whether the state court applied Strickland to the facts of petitioner's case in an objectively unreasonable manner. Malone, 536 F.3d at 63. We will address each of petitioner's ineffective assistance claims in turn.

### 1. Failure to Provide Conflict-Free Representation

Petitioner alleges that he was deprived of the effective assistance of counsel because his trial counsel's conflict of interest prevented counsel from aggressively challenging the testimony of Dr. Kessler, the Commonwealth's medical examiner whom counsel concurrently represented. Because his trial counsel labored under an "actual conflict of interest" in representing him, petitioner argues that prejudice is presumed and he is entitled to relief without independent proof of prejudice as required under Strickland. See Cuyler v. Sullivan, 446 U.S. 335, 349-50 (1980). Alternatively, petitioner argues that he can show that the dual representation adversely affected the representation because it caused counsel to: (a) refrain from cross-examining Dr. Kessler about the timing and cause of Jameel's death as aggressively as he would have absent the conflict; and (b) refrain from calling another expert witness to rebut Dr. Kessler's conclusion that Jameel died as a result of multiple blunt traumatic injuries.[8] As

_____

[8] At the evidentiary hearing on the motion for a new trial Yeboah-Sefah called an expert, Dr. Ira Kanfer, who testified that while the child suffered several other injuries, he felt that the cause

-22-

a result, petitioner contends that trial counsel failed to advance a theory that Jameel died after the first blow, which, if pursued, would have undermined the prosecution's theory of first degree murder based on extreme atrocity and cruelty, of which petitioner was ultimately convicted.

As a threshold matter, although petitioner has failed to establish that his waiver of trial counsel's conflict was involuntary or invalid, "under our precedent it would appear that even a knowing acceptance by defendant of counsel's representation despite a potential conflict of interest does not preclude a showing, under the standard of <u>Cuyler</u>, that the conflict became actual and had an adverse effect on representation." <u>United States</u> v. <u>Rodríguez-Rodríguez</u>, 929 F.2d 747, 750 (1st Cir. 1991)(citations omitted); <u>see also</u> <u>United States</u> v. <u>Fahey</u>, 769 F.2d 829, 835 (1st Cir. 1985) ("Although we find that [petitioner] executed a knowing and intelligent waiver of [counsel's] potential conflict of interest, a waiver doesn't foreclose the possibility that an actual conflict could adversely have affected the adequacy of representation and violated [petitioner's] [S]ixth Amendment right to counsel."). "However, '[if] a defendant has voluntarily chosen to proceed with [a potential conflict] . . . it is fair, if he later alleges ineffective assistance growing out of a conflict, to require that he demonstrate that a conflict of interest actually

of death was "one blow" to the head, "which came first."

-23-

affected the adequacy of representation.'" Fahey, 769 F.2d at 835 (quoting Cuyler, 446 U.S. at 335 (Brennan, J., concurring)).

The SJC heard this claim and rejected it on the merits, holding that the dual representation did not warrant a reversal of the convictions because trial counsel's conflict of interest, was "only potential, not actual." Boateng, 781 N.E.2d at 1217.[9] In so holding, the SJC distinguished a state case petitioner relied upon, Commonwealth v. Hodge, 434 N.E.2d 1246 (Mass. 1982), in which the SJC concluded that a defendant received ineffective assistance because his trial counsel's law firm partner represented a key prosecution witness in an unrelated civil proceeding. Here the SJC noted that unlike in Hodge, where the conflict of interest caused the conflicted attorney to refuse to present important evidence on the defendant's behalf, it could not conclude, in this case, that "trial counsel's representation of the medical examiner prevented him from presenting important evidence on [petitioner's] behalf . . . ." Boateng, 781 N.E.2d at 1218. Rather, the court "disagree[d] that the circumstances [were] similar and that the evidence to which [petitioner] now points would have assisted him." Id.

The SJC reasoned that to the extent that a more aggressive cross-examination of Dr. Kessler or the rebuttal

---

[9] The trial court, in rejecting petitioner's new trial motion also found "that the potentiality of conflict never did metamorphose, during trial, into an actual conflict." Boateng, 2000 WL 1481424 at *5.

-24-

testimony of Dr. Kanfer would have "present[ed] an alternative 'single blow' theory[10] to rebut the conclusions of the medical examiner," such testimony would not have assisted the petitioner in defending against charges of "extreme atrocity or cruelty."  This is because, as a matter of Massachusetts law, even a single blow, especially when directed against an infant, may support a finding of extreme atrocity or cruelty.  Id. (citing Commonwealth v. O'Brien, 736 N.E.2d 841 (Mass. 2000)).   Moreover, under Massachusetts law, murder may be found to have been committed "with extreme atrocity or cruelty" based on a jury's finding of any one of the so-called Cunneen factors: defendant's indifference to the victim's suffering, the degree of the victim's suffering, the extent of the injuries, the number of blows, the manner and force with which the wounds occurred, and the disproportion between the means necessary to cause death and the force employed by the defendant.  See Commonwealth v. Cunneen, 449 N.E.2d 658, 665 (Mass. 1983).   Given that the jury heard evidence that Yeboah-Sefah "crushed [the baby's] skull, broke several of his ribs, and seriously damaged his lungs," the SJC concluded that the jury had "ample evidence" from which to make such a finding.  Boateng, 781 N.E.2d at 1218.   Further, the SJC found that "the medical

---

[10]   Petitioner's "single blow" theory is basically that despite administering multiple blows to the baby, the baby may have died from the first blow.  Thus, the additional blows did not result in additional suffering during the remainder of the attack, detracting from the atrocity or cruelty of the murder.

examiner's testimony regarding the cause of death was peripheral to [petitioner's] defense of insanity," and in fact, based on trial counsel's testimony at the hearing on the new trial motion, "aspects of the medical examiner's testimony, . . . including the ghastliness of the killing, that supported the defense theory of insanity." Id.

We find that § 2254(d)(1) of AEDPA applies to petitioner's claim that his trial attorney provided ineffective assistance of counsel due to a conflict of interest because the SJC heard and adjudicated this claim on the merits.[11] Analyzing that decision through the lens of AEDPA, we are unable to conclude that the SJC "appli[ed] [Supreme Court] precedents to the facts in an objectively unreasonable manner." Brown v. Payton, 544 U.S. 133, 141 (2005). Under "clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), an ineffective assistance claim normally requires demonstrating "prejudice," i.e. a "reasonable probability that, but for counsel's unprofessional

---

[11]  Petitioner argues that the SJC failed to address petitioner's federal constitutional claim on the merits because it applied its own conflict of interest law, established in Hodge, 434 N.E.2d 1246, to the claim rather than a federal standard and therefore, we must review this claim de novo. However, Hodge is premised on a Massachusetts constitutional standard governing conflicts of interest expressly held to be more favorable to defendants than federal law. See Teti, 507 F.3d at 56-57. "[W]here  state law is explicitly more favorable to defendants than the federal standard, we  will presume the federal law adjudication to be subsumed within the state law  adjudication." Id. at 56 (quotation marks omitted). Therefore, deference under AEDPA applies to petitioner's claim.

errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. If however, "the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance,'" then Strickland's stricter prejudice showing does not apply. Id. at 692-93 (quoting Cuyler, 446 U.S. at 348); see United States v. Segarra-Rivera, 473 F.3d 381, 385 n.2 (1st Cir. 2007) (distinguishing claims alleging counsel performed incompetently, which require showing of prejudice, from claims showing that counsel labored under "actual conflict of interest," which may entitle petitioner to "relief without regard to proof of prejudice"). Under the standard delineated by the Supreme Court, however, a "mere theoretical division of loyalties" is not itself, contrary to petitioner's contentions, an "actual conflict of interest." Mickens v. Taylor, 535 U.S. 162, 171 (2002). Rather, a potential division of loyalties rises to the level of an "actual conflict" only where defendants shows that the conflict "actually affected the adequacy of his representation." Id.; see also United States v. Newton, 326 F.3d 253, 264 (1st Cir. 2003) ("adverse performance is the touchstone of Sixth Amendment error under the Supreme Court's actual conflict-of-interest jurisprudence . . ."). "Showing an adverse effect . . . requires more than mere speculation." United

States v. DeCologero, 530 F.3d 36, 77 (1st Cir. 2008).[12]  Rather, "some adverse action or inaction is required that can be traced to the conflict in loyalty."  United States v. Burgos-Chaparro, 309 F.3d 50, 53 (1st Cir. 2002).

Here, the SJC determined that trial counsel presenting the "single blow" theory, through questioning of Dr. Kessler or by calling a separate pathologist, would not have helped petitioner's defense, and thus, petitioner had failed to establish that the dual representation adversely affected the adequacy of representation. In light of the overwhelming evidence of brutality present on the record, it was certainly reasonable to conclude that any testimony elicited from Dr. Kessler or another expert, that in fact the first of petitioner's numerous blows to the baby was of sufficient force as to be fatal, would not cause a reasonable juror to doubt whether the murder was atrocious or cruel.  The SJC, thus, logically held that counsel's alleged conflict of interest did not rise to the level of an actual conflict of interest.

We cannot conclude that the SJC's decision constituted an unreasonable application of Federal law.

---

[12]  As this court has interpreted the "adverse effect" requirement, the defendant "must show that [the attorney] might plausibly have pursued an alternative defense strategy, and that the alternative strategy was in conflict with, or may not have been pursued because of, [the attorney's] other loyalties or interests."  DeCologero, 530 F.3d at 77 (quoting United States v. Ramírez-Benítez, 292 F.3d 22, 30 (1st Cir. 2002))(alterations in original).

-28-

## 2. Failure to Elicit Opinion from Government Witness With Respect to Extreme Atrocity or Cruelty

Petitioner further alleges that his trial counsel rendered constitutionally deficient performance by failing to elicit testimony, on cross-examination, from the Commonwealth's psychologist, Dr. Whaley, regarding petitioner's capacity to appreciate the atrocity or cruelty of his actions. In an affidavit submitted by Dr. Whaley, after trial, in support of petitioner's new trial motion, Dr. Whaley states that he believed that petitioner's "mental illness prevented him from being able to mentally appreciate that he was acting with extreme atrocity or cruelty when he killed his son." Although Dr. Whaley testified at trial as to petitioner's diminished capacity to premeditate -- a defense to the other theory of murder of which he was acquitted -- Dr. Whaley was not asked, and thus did not testify to his conclusions regarding the effect of petitioner's diminished capacity upon his subjective ability to appreciate atrocity and cruelty. Petitioner argues that trial counsel's failure to elicit that opinion prejudiced petitioner in fact because such testimony would have been a colorable defense to charges of first degree murder based on the theory of extreme atrocity or cruelty, of which he was ultimately convicted.

The government asserts that this claim, which petitioner raised for the first time in an addendum to his second new trial motion, was rejected by the state court based on an adequate and

independent state procedural ground, and thus, federal habeas review is barred. See Walker, 506 F.3d at 21 ("Normally, the fact that a claim is procedurally defaulted in state court is an adequate and independent state ground precluding federal habeas relief."). As "[i]t is customary to address the procedural default issue on habeas first," Lynch, 438 F.3d at 47 n.10, we will begin by considering whether Yeboah-Sefah's claim regarding ineffective assistance based on the failure to elicit this particular opinion from Dr. Whaley was denied by the Massachusetts court based on an "independent and adequate" state procedural ground. We concluded that it was.

This federal claim was raised by petitioner for the first time in petitioner's second new trial motion in 2005, which was denied by the trial court. Petitioner appealed the denial and the claim was ultimately disposed of in a memorandum decision by a single justice of the SJC pursuant to Massachusetts' "gatekeeper statute," on the ground that the motion did not raise a "new or substantial" issue for the court.[13] Boateng, No. SJ-2006-0021, at 4. An issue is not "new" for purposes of the statute if it could

---

[13] Under Massachusetts' "gatekeeper statute", judicial review of the denial of a post-conviction motion in a first degree murder case is prohibited unless permitted at the discretion of a single justice of the SJC "on the ground that it presents a new and substantial question which ought to be determined by the full court." Mass. Gen. Laws ch. 278, § 33E. Because Yeboah-Sefah was convicted of murder in the first degree, his state appeals from the denial of state collateral attacks on his conviction after his direct appeal were governed by § 33E.

-30-

have been addressed at trial or on direct review, had the defendant properly raised it there. See Commonwealth v. Ambers, 493 N.E.2d 837, 839 (Mass. 1986) (explaining that § 33E "requires that the defendant present all his claims of error at the earliest possible time, and failure to do so precludes relief on all grounds generally known and available at the time of trial or appeal"). We hold that the single justice's decision to deny full SJC review of petitioner's claim under § 33E is based on a state procedural waiver, namely, his failure to raise that claim in prior state proceedings, and therefore, rests on an independent and adequate state ground for decision. See Coleman, 501 U.S. at 729-30.

This court has previously held, on facts similar to those before us, that a "gatekeeper" justice's denial of a petition for collateral review on the ground that the federal claim raised therein was not "new and substantial," pursuant to § 33E, constitutes an independent and adequate state ground for decision. See Simpson v. Matesanz, 175 F.3d 200, 206 (1st Cir. 1999). At least "[w]here there has been procedural waiver below," the denial of review under § 33E qualifies as an independent and adequate state ground. Id., cf. Phoenix v. Matesanz, 189 F.3d 20, 25-26 (1st Cir. 2000) (finding that denial of review by gatekeeper justice on grounds that petitioner's ineffective assistance claim was "not substantial" (although new), reached the merits of the

federal claim, and thus could not be treated as being grounded in state law) (emphasis added).

The single justice who considered petitioner's § 33E petition found that this particular ineffective assistance claim, which was raised for the first time in petitioner's second new trial motion, was "not new or substantial," within the meaning of the statute. Noting that "[a]n issue is not 'new' under the statute 'if it could have been addressed at trial or during a previous appeal,'" Boateng, No. SJ-2006-0021 at 4 (citing Commonwealth v. Rudolph, 780 N.E.2d 58, 64 n.7 (Mass. 2002)), the justice reasoned that because "the essential factual basis of this second motion for new trial was spread upon the pages of the 2003 [SJC] decision [on petitioner's direct appeal], the questions raised here 'could' have been addressed in that appeal." Id. at 5. Although the gatekeeper justice briefly discussed the merits of petitioner's waived claim in determining that it was also "not substantial," the decision primarily rested on the determination that the claim was not "new," based on a procedural waiver below, which serves as an independent and adequate procedural basis. See Phoenix, 189 F.3d at 26 n.2 (noting that "it does not undercut the adequacy and independence of the state grounds" if the single justice found a procedural default, but then briefly reviewed the merits of a claim for miscarriage of justice under state law). Thus, we are persuaded that the state court decision rejecting

petitioner's claim of ineffective assistance of trial counsel rested on adequate and independent state procedural grounds.

Finding procedural default, we are precluded from reaching the merits of the claim unless petitioner can show "cause for the default and actual prejudice as a result of the alleged violation of federal law." Lynch, 438 F.3d at 45 (citing Coleman, 501 U.S. at 750); see also Walker, 506 F.3d at 21 (discussing grounds upon which procedural default can be excused). To the extent that Yeboah-Sefah makes a cursory attempt to attribute "cause" to the ineffective assistance of his prior post-conviction counsel, this argument is easily dismissed. Deficiency by counsel rising to the level of constitutionally ineffective assistance under Strickland can serve as cause to excuse the procedural default of another habeas corpus claim. See Edwards v. Carpenter, 529 U.S. 446, 451 (2000).[14] However, to the extent that petitioner superficially makes such a claim, he fails to develop it properly, and in any event, has not exhausted it by raising it in the state courts. See Lynch, 438 F.3d at 46 (explaining that any ineffective

---

[14] Alternatively, a lesser error by counsel can also serve as "cause" for procedural default, but "must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule," such as, for example, the "factual or legal basis for a claim [not being] reasonably available to counsel," or "some interference by officials." Murray v. Carrier, 477 U.S. 478, 488 (1986) (internal citations omitted). Petitioner alleges no such external impediments to the inclusion of this claim in his initial new trial motion.

assistance claim must be itself exhausted before it may be used to excuse a procedural default of another federal claim). As petitioner has failed to excuse his procedural default, "[c]onsiderations of comity and federalism bar the federal court's review." Simpson, 175 F.3d at 206. (internal quotation marks omitted).

### 3. Failure to Call Promised Mental Health Expert

Petitioner further alleges that his trial counsel's performance was constitutionally deficient in failing to present the testimony of a particular psychologist, Dr. Paul Spiers, despite "promising" the jury in his opening that both "[p]sychologists and psychiatrists" would testify in support of petitioner's insanity defense. This failure prejudiced him, petitioner argues, because Dr. Paul Spiers, a psychologist who examined him, would have provided petitioner with his only defense to charges arising from the assault upon Alecia Moore. Specifically, unlike Dr. Rosemarin, who testified regarding Yeboah-Sefah's diminished mental capacity at the time of the attack on Jameel but was unable to form an opinion regarding petitioner's mental state during the attack on Moore, Dr. Spiers had concluded and could have testified that petitioner lacked criminal responsibility for his actions on October 25, 1992 with respect to his assaults on both Alecia and Jameel. Therefore, Yeboah-Sefah's trial counsel's unreasonable failure to call Dr. Spiers, in breach

of his promise to the jury, constituted deficient performance that prejudiced the defense.

The SJC heard this claim and rejected it on the merits, holding that trial counsel's failure to call Dr. Spiers "was not a manifestly unreasonable tactical decision on trial counsel's part." Boateng, 781 N.E.2d at 1220. The court reasoned that because Dr. Spiers' diagnosis regarding Yeboah-Sefah's condition conflicted with Dr. Rosemarin's and Dr. Whaley's, Dr. Spiers' testimony had the potential to confuse the jury, and thus, was reasonably omitted.[15] Id. at 1219-1220. The SJC also held that there was no prejudice as a result of the decision, noting that "while Dr. Spiers' testimony might have provided [Yeboah-Sefah] with a more complete defense in the sense that he was of the opinion that [Yeboah-Sefah] was not criminally responsible for either of the attacks on Jameel or Moore, it is unlikely that the jury, who rejected [Yeboah Sefah's] insanity defense as a defense to the murder of Jameel, would have accepted it regarding the assault on Moore that occurred just before." Boateng, 781 N.E.2d at 1220. We

_____

[15] The SJC found, in contrast to Dr. Rosemarin, that Dr. Spiers "testified to a different diagnosis of [Yeboah-Sefah's] condition," namely, that Yeboah-Sefah, in a recent trip abroad, had been exposed to a virus that caused "encephalitis and seizures," and that he "was suffering from one of these seizures on the day of the attacks." Boateng, 781 N.E.2d at 1219. Accordingly, the SJC concluded that Dr. Spiers' testimony "could certainly have confused a jury that had, until that point, heard fairly consistent testimony that [Yeboah-Sefah] suffered from a different serious mental condition," and that trial counsel "elected not to call [Dr. Spiers] in an effort to avoid this confusion." Id. at 1220.

-35-

find that this decision was not an unreasonable application of Strickland.[16]

The SJC, however, did not explicitly address petitioner's claim that it was the failure to call Dr. Spiers in light of counsel's "promise" to do so in his opening statement that rendered his performance ineffective. In other words, despite the pros and cons of calling Dr. Spiers, petitioner argues that counsel's "failure to follow through" was itself deficient. See Anderson v. Butler, 858 F.2d 16, 17 (1st Cir. 1988) (noting that "little is more damaging than to fail to produce important evidence that had been promised in an opening"). Because the state court was presented with, but did not expressly resolve this portion of petitioner's claim, we assume, without deciding, that de novo review applies. See Fortini, 257 F.3d at 47 (holding that preserved federal constitutional claims that were "never addressed by the state courts" would be reviewed de novo on habeas). Applying Strickland de novo, we are unable to conclude that trial

---

[16] In so holding we consider various factual determinations made by the trial court in petitioner's first new trial motion, which, under AEEDPA, we presume to be correct. 28 U.S.C. § 2254(e)(1); see also Teti, 507 F.3d at 58. The court determined that trial counsel's decision to present the insanity defense through Dr. Rosemarin rather than Dr. Spiers was grounded upon "Dr. Rosemarin's more defense-supportive diagnoses, his abstention from reliance on the improbable evidence of hallucination, and his more extensive familiarity with the defendant's circumstances." Moreover, defense counsel believed that "Dr. Spiers' testimony might contradict the opinions of Dr. Rosemarin, thus undermining the defense of NGI." Boateng, 2000 WL 1481424 at *3.

counsel's reference to "psychologists and psychiatrists" in his opening statement coupled with the failure to call a particular psychiatrist deprived petitioner of the effective assistance of counsel.

"This court . . . has invalidated convictions because of broken promises [in an opening statement]." Sleeper, 510 F.3d at 40 (citing Anderson, 858 F.2d 16; United States v. González-Maldonado, 115 F.3d 9 (1st Cir. 1997); and Ouber, 293 F.3d 19). However, considering trial counsel's reference to "psychologists and psychiatrists" in the context of the record, we find that the statement did not contain an explicit promise that the defense would call both psychiatrists and psychologists to the stand, let alone a specific promise to call Dr. Spiers.[17] Rather, counsel told the jury that "[p]sycholgists and psychiatrists will talk about the medical affects [sic] of [Yeboah-Sefah's] medication" upon him, and that the jury would "hear testimony by experts" during the course

---

[17] Counsel's statement, in relevant context proceeded as follows:

> You will hear evidence about how that medication affects [Yeboah-Sefah] and how it makes him look in front of you as he sits here today. Psychologists and psychiatrists will talk about the medical affects [sic] of that medication, what they do to a person's mind and how they make that person appear to others.
> [Yeboah-Sefah] was seen by psychiatrists, psychologists after the incident, seen by those retained by [the prosecutor] . . . You will hear testimony by experts during the course of this trial as to their assessment of [Yeboah-Sefah's] level of capacity at the time of the incident on October 25, 1992.

of [the] trial assessing petitioner's capacity. Thus, the only actual "promises" made by counsel therein were not in fact broken. Over the course of the trial, jurors did in fact hear the testimony of both a psychiatrist (Dr. Rosemarin) and a psychologist (Dr. Whaley) regarding the effects of petitioner's medications upon him and his mental capacity at the time of the crime.

Even if counsel's statement could be construed as an implied promise that the defense would call a psychologist, it still would not amount to the kind of specific, significant and dramatic promise upon whose breach our case law supports invalidating a conviction. "[O]ur cases that premise a habeas writ on an unfulfilled promise during opening argument generally require greater specificity in the promise and greater contemporaneousness between the promise and jury deliberations." Phoenix, 233 F.3d at 85.[18] In this case, the "promise," which was made in an opening statement six days before the end of trial, can hardly be considered contemporaneous with the jury's deliberations. Cf. Anderson, 858 F.2d at 17 (finding ineffective assistance of counsel where the jury began deliberating the following day after counsel's

---

[18] In Phoenix we rejected an ineffective assistance claim on habeas, holding that the failure to grant new trial based on unfulfilled promise in opening that "if anything, tests will show that . . . some of the blood that was on the bag . . . could not have been the blood of [the victim]" was not unreasonable, as promise was not "dramatic" and omitted testimony was not "strikingly significant." See 233 F.3d at 85 (ellipses in original).

-38-

opening, in which counsel promised to present a defense based on expert testimony that he never produced). Moreover, a general statement that jurors would hear from "psychiatrists and psycholgists" can hardly be construed as specific. Although petitioner attempts to characterize the statement as a promise to call a particular psychologist, Dr. Spiers, that proposition is unsupported by the record.[19]

---

[19] Petitioner claims that this case is indistinguishable from our precedents in Anderson and Ouber. We disagree. In Ouber, we found deficient performance under Strickland where defense counsel, in his opening statement, "promised, over and over, that the petitioner would testify and exhorted the jurors to draw their ultimate conclusions based on her credibility," but ultimately advised the defendant against testifying. 293 F.3d at 28. In that case, we found that "the lawyer structured the entire defense around the prospect of the petitioner's testimony," which he ultimately omitted. Id. Ouber is clearly distinguishable from this case, where defense counsel made a single reference in his opening to "psychiatrists and psychologists," though the latter was not ultimately called by the defense. Likewise, in Anderson, we found deficiency and prejudice under Strickland where trial counsel failed to call any expert witnesses during first-degree murder trial, despite promising to call both a psychiatrist and psychologist in his opening statement the previous day. Anderson, 858 F.2d at 17. In that case, the court characterized the promise as "dramatic" and the indicated testimony "strikingly significant," id., and stated that the chosen course of action could not have been a "strategic choice," as the "there could be nothing to gain" from so proceeding. Id. at 19. Unlike in Anderson, where the entire mental incapacity defense promised was essentially abandoned as a result of the breach, in this case the testimony of one additional psychologist can hardly be classified as "strikingly significant" given that several other mental health experts did testify regarding petitioner's mental capacity. Moreover, in this case, unlike in Anderson, as the record indicates, the decision to not call Dr. Spiers, can fairly be characterized as a "strategic choice" on the part of counsel to not confuse the jury with conflicting testimony.

We find that counsel was not "professionally unreasonable" and thus, not ineffective in withholding the testimony of Dr. Spiers, despite the statements made in his opening. See Strickland, 466 U.S. at 691. Petitioner, therefore, cannot satisfy Strickland, and we must reject this claim.

### 4. Failure to Challenge Admissibility of Pre-Trial Statements to Civilians and Police

Petitioner further alleges that his counsel provided ineffective assistance in failing to challenge, on voluntariness grounds, the admissibility of Yeboah-Sefah's pre-trial statements to Moore, Moore's mother, and to the police in the immediate aftermath of the crime.[20] Petitioner alleges that the statements to Moore and Hall were involuntary, while the statements to police were also inadmissible because petitioner, due to his mental illness, could not provide a knowing and intelligent waiver of his Miranda rights. Petitioner asserts that counsel's failure to challenge the admission of these statements was prejudicial because the Commonwealth relied on the statements, to show that petitioner

---

[20] Petitioner challenges the admission of his statement on the phone to Hall that "Moore was out doing laundry" when Hall called asking to speak to Moore. He also challenges his statement that he "wasn't going to jail," made in Moore's presence, after hearing the knock at the door and proceeding to go into the bathroom and drink bleach. As for the statements to police, petitioner challenges his statements made to officers on the scene, after being read and agreeing to waive his Miranda rights, in which he admits to beating Moore and Jameel.

could think rationally at the time of the incident, which undermined his insanity defense.

The parties dispute whether this claim was "adjudicated on the merits" so as to give rise to deference under § 2254(d)(1). This is not entirely clear. While the SJC adjudicated petitioner's related argument regarding the trial court's failure to conduct a suppression hearing sua sponte,[21] it did not directly address whether counsel was ineffective in failing to request one. The ineffective assistance claim was however, addressed in a lower state court decision, in which the trial court judge denied

---

[21] Petitioner makes a related claim that he is entitled to habeas relief because, despite counsel's failure to request a hearing on the admissibility of petitioner's statements to Moore, her mother and police, the trial court violated his Due Process and Equal Protection rights by failing to hold a voluntariness hearing sua sponte. However, federal law, in contrast to Massachusetts law, imposes no obligation on courts to conduct a voluntariness hearing sua sponte. Compare Wainwright v. Sykes, 433 U.S. 72, 86 (1977) ("Constitution does not require a voluntariness hearing absent some contemporaneous challenge to the use of the confession"), with Commonwealth v. Harris, 358 N.E.2d 982, 988 (Mass. 1976) (holding that to prevent miscarriage of justice "trial judge has a responsibility-independent of a request by defense counsel" to order voir dire on the voluntariness of a confession). "Ordinarily a federal court may not issue a writ 'based on a perceived error of state law.'" Brown v. Maloney, 267 F.3d 36, 44 (2001) (quoting Pulley v. Harris, 465 U.S. 37, 41 (1984)). "[A]lthough there may be an exception if an error of state law could be sufficiently egregious to amount to a denial of equal protection or of due process of law," we cannot say that the state court's failure to apply its own rule in this case "rose to the level of a deprivation of due process where the federal rule governing the same situation would not require [relief]." Id. (internal citations omitted).

-41-

petitioner's first new trial motion.[22]  While the SJC did, in a footnote, cite to the trial court on this issue, it did not explicitly adopt the trial court's conclusion.  See Boateng, 781 N.E.2d. at 1214 n.5.  As our sister circuit has recognized, "it is not clear whether an adjudication on the merits by a trial court, which is neither explicitly affirmed on the merits nor explicitly rejected by the appellate court, is sufficient to trigger AEDPA review."  DeBerry v. Portuondo, 403 F.3d 57, 68 (2d Cir. 2005) (explicitly declining to decide the question).  However, as in DeBerry, we need not decide this question on the facts of this case because, even reviewing the claim de novo, we are unable to conclude that trial counsel's failure to challenge the admissibility of petitioner's pre-trial statements satisfies the "prejudice" prong of Strickland.  See Sleeper, 510 F.3d at 39.

As for petitioner's claim regarding statements to Moore and Hall, we cannot discern any "reasonable probability" "that the

---

[22]  In rejecting petitioner's new trial motion, the trial court concludes as follows:

> The court finds no evidence that TDC's election not to seek exclusion of defendant's statements was manifestly unreasonable.  TDC did not attempt to suppress defendant's statements because he thought such a motion was unlikely to succeed and because he thought that suppressing or diminishing the effect of defendant's admissions would probably serve only to erode his insanity defense.  Those decisions were not manifestly unreasonable.

Boateng, 2000 WL 1481424, at *8.

outcome of the trial would have been different" had defense counsel objected to their admission given the unlikelihood that such objection would have succeeded. Under Massachusetts law, statements to private parties contemporaneous with a criminal act are not subject to voluntariness analysis. See Commonwealth v. LaCava, 783 N.E.2d 812, 822 n.12 (Mass. 2003). As the SJC concluded, it had "no trouble deciding that [petitioner's] statements to Moore and her mother occurred during the commission of the crimes." Boateng, 781 N.E.2d at 1214 n.3 (emphasis added). In light of this opinion, rendered by the ultimate authority on questions of Massachusetts law, it is fair to conclude that any attempt by counsel to object to the admission of the statements made to these private individuals would have been fruitless, and thus, no prejudice resulted from the failure to do so.

We are also persuaded that trial counsel's failure to seek suppression of petitioner's statements to the police in the aftermath of the incident did not prejudice the petitioner. At the hearing on petitioner's first new trial motion, trial defense counsel testified in defense of his trial tactics. On the basis of said testimony, the trial court made several factual findings relevant to the instant claim to which, even when reviewing the legal issues de novo, we are nevertheless required to defer. See 28 U.S.C. § 2254(e)(1) (requiring that a state court's factual finding be "presumed to be correct" unless the petitioner rebuts

this presumption by "clear and convincing evidence"); accord Demosthenes v. Baal, 495 U.S. 731, 735 (1990) (finding that "state court's determinations on the merits of a factual issue are entitled to a presumption of correctness on federal habeas review," and further noting that "a state court's conclusion regarding a defendant's competency is entitled to such a presumption"). Those findings were as follows:

> 1.   The evidence adduced at the Rule 30 hearings was not persuasive that defendant was incompetent, by reason of his mental condition, voluntarily to utter statements and to waive his Miranda rights.
> 2.   The statements defendant uttered, both with and without Miranda compliance, rationally tended to support his determination, at trial, to pursue the defense that he was not guilty by reason of insanity ("NGI").
> . . .
> 6. TDC determined that the evidence of defendant's admissions was not harmful to, and, indeed, supported the defense theory of NGI.  Accordingly, he did not seek to suppress that evidence or otherwise exclude it from evidence.  So too, his determination not to call upon medical professionals to challenge the voluntariness of defendant's admissions was founded upon his view that, were he to succeed in suppressing or diminishing the effect of the admissions, he would most probably accomplish only an erosion of his NGI defense.  He wanted some of the statements, such as the threats against Alecia, to come into evidence to bolster the NGI defense; he did not want to reveal certain information about defendant's mental state in advance of trial; and, in any event, he believed that a challenge to voluntariness was, on the facts, unlikely to succeed.  In sum, counsel, resolved, as a tactical choice, to support the

> NGI theory with defendant's admissions and insanity-evocative conduct.

_Boateng_, 2000 WL 1481424 at *2-3. Based on these findings, as well as our own review of the record, we are persuaded that trial counsel's failure to challenge the admissibility of petitioner's statements to police as either involuntary or obtained through an invalid waiver of his Miranda rights, did not prejudice the petitioner within the meaning of _Strickland_.

First, any attempt by counsel to suppress the statements likely would have failed. Even where _Miranda_ warnings and procedures are adhered to, if petitioner's waiver of his Fifth Amendment privilege was not in fact knowing and intelligent, the subsequently made statements would be subject to suppression. See _Dickerson_ v. _United States_, 530 U.S. 428, 444 (2000). But "[w]hile the fact that a defendant was given _Miranda_ warnings does not "dispense with the voluntariness inquiry," the "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." _Id._

Petitioner here does not claim that the warnings and procedures required by _Miranda_ were breached by the police. Moreover the trial court made a factual finding, entitled to a presumption of correctness under § 2254(e)(1), that the evidence showed petitioner to be sufficiently competent to accomplish a voluntary waiver of his _Miranda_ rights. _Boateng_, 2000 WL 1481424

-45-

at *2. These facts, along with petitioner's calm demeanor following the incident when the challenged statements were made, and the absence of any evidence of police coercion or intimidation, collectively suggest that it was quite unlikely that counsel would have actually succeeded in suppressing the statements had he endeavored to do so. See United States v. Guerrero, 114 F.3d 332, 338 (1st Cir. 1997) (discussing factors relevant to voluntariness determination).

Secondly, although petitioner argues that he was prejudiced by the admission of his statements to police officers, in that the prosecution relied on them to negate his insanity defense, it appears that what was most prejudicial about those statements was not their substance (after all, it was never disputed that petitioner committed the criminal acts), but the calm, rational manner in which he made them. But even if the statements were suppressed, the testimony of police officers as to their observations of petitioner's calm demeanor after the incident would nevertheless likely be admissible and probative on the question of sanity, thereby undermining any claim of prejudice from the admission of the statements themselves. See United States v. LeRoy, 944 F.2d 787 (10th Cir. 1991)(lay opinion as to person's sanity is admissible if witness has observed his conduct). Thus, to the extent that petitioner's statements constituted evidence adverse to his insanity defense, we are convinced that they

-46-

constituted peripheral circumstantial evidence that could not have had a decisive effect on the jury's verdict. Moreover, the trial court's issuance of a "humane practice" instruction, whereby the jury was specifically instructed to determine independently whether petitioner's statements were voluntary before considering them as evidence of guilt, further reduces the risk of adverse effect from trial counsel's failure to move for the suppression of petitioner's statements to police on voluntariness grounds.[23] As petitioner cannot establish prejudice as required under Strickland, this ineffective assistance claim must fail.

### 5. Failure to Request Second Competency Hearing

Finally, petitioner contends that his trial counsel's failure to request a second competency hearing on the day of trial renders his representation constitutionally defective. He asserts that under Massachusetts law, the court is required to hold an

---

[23] Petitioner makes a separate ineffective assistance of counsel claim based on trial counsel's failure to object to the "humane practice" jury instruction. Petitioner argues that the instruction was incomplete because while it instructed the jury to determine whether petitioner's statements were voluntary before considering them, it failed to inform the jury that the Commonwealth had the burden of proving voluntariness beyond a reasonable doubt. See Commonwealth v. Grenier, 615 N.E.2d 922, 926 (Mass. 1993). Petitioner alleges that he was prejudiced by this failure because the absence of "beyond a reasonable doubt" language increased the likelihood that the jury would consider the statements. For mainly the same reasons that we find that counsel's failure to challenge the admission of the statements themselves did not prejudice the petitioner, we also find non-prejudicial counsel's failure to object to the jury instruction regarding the circumstances under which the jury could consider those statements.

evidentiary hearing on the defendant's competency to stand trial when there arises a "substantial question of possible doubt" about the defendant's competence, see Commonwealth v. Hill, 375 N.E.2d 1168, 1170-71 (Mass. 1978), and that such doubt existed in this case. However, a competency hearing had taken place on February 24, 1994, just five days before the start of trial. At that hearing a forensic psychologist testified that defendant was "competent to stand trial," an opinion which the court adopted. Thereafter, trial counsel advised the court that he was waiving a previously-filed motion for a second competency hearing. The judge responded, "I am satisfied, unless someone tells me that there has been a change of circumstances." Trial counsel responded that he was "unaware of any since [the holding of the competency hearing] last week." As a result, the court made no further competence inquiry.

This claim was heard and adjudicated on the merits by the SJC, and therefore, deference under AEDPA applies. See 28 U.S.C. § 2254(d). The SJC concluded that counsel's performance was not deficient, reasoning that petitioner had "presented no evidence whatsoever to contradict trial counsel's statement to the court on the first day of trial that [petitioner's] condition had not changed in the intervening week." Boateng, 781 N.E.2d at 1219. Thus, the court concluded that "[t]here were no grounds on which to

request a new hearing, and trial counsel's decision not to request one was not error."  Id.

While "clearly established" federal law provides that a significant change in circumstances in the midst of trial may render a second competency hearing proper, see Drope v. Missouri, 420 U.S. 112, 181 (1975), there is no evidence of any such circumstances present on these facts, and thus, no indication that trial counsel failed to exercise "reasonable professional judgment" in not requesting a subsequent hearing.  Strickland, 466 U.S. at 690.  Thus, we cannot say that the SJC applied Strickland in an objectively unreasonable manner in finding a lack of deficiency in counsel's performance.

## D.  Court's Failure to Conduct Second Competency Hearing

In his final claim petitioner alleges that the trial court violated his constitutional right to due process of law because it failed to conduct a competency hearing sua sponte on the first day of trial or anytime thereafter, despite there being doubt regarding his competency.  As with the related ineffective assistance claim, the SJC rejected this argument on the merits, reasoning that a trial judge is required to conduct a sua sponte inquiry only if a "substantial question of possible doubt" as to competence arises.  Boateng, 781 N.E.2d at 1213.  But here, "[o]n the first day of trial, trial counsel withdrew his previously filed motion for a competency hearing as moot, and informed the judge

-49-

that nothing had occurred within the past week to warrant a new inquiry." Id. The court concluded that "[i]n these circumstances there was no substantial question that required the judge's sua sponte action." Id.

It is clearly established by Supreme Court precedent that "the criminal trial of an incompetent defendant violates due process." Cooper v. Oklahoma, 517 U.S. 348, 354 (1996). Due process also requires a court to give "proper weight to the information suggesting incompetence which [comes] to light during trial," and hold a competency hearing sua sponte in the event that such evidence is brought to its attention. See Drope, 420 U.S. at 179 (holding that further inquiry on competency was required where petitioner's suicide attempt, during the course of trial, raised sufficient doubt as to competence). In this case, however, petitioner was determined to be competent a week prior to trial and no evidence was brought to the attention of the court indicating that its earlier competence determination needed to be revisited. We cannot say on these facts that the SJC's decision rejecting petitioner's claim was anything less than a reasonable application of federal law.

Therefore, this claim, and all of petitioner's claims for relief, must fail.

## III. <u>Conclusion</u>

For the foregoing reasons, we affirm the denial of this petition for habeas corpus.

**<u>Affirmed</u>**.