## Commonwealth *vs.* Anthony Chambers.

No. 10-P-60.

Suffolk. November 9, 2010. - April 25, 2012.

Present: McHugh, Sikora, & Fecteau, JJ.[1]

Further appellate review granted, 462 Mass. 1104 (2012).

*Homicide. Evidence,* Prior violent conduct, Reputation. *Practice, Criminal,* Opening statement, Instructions to jury, Witness. *Witness.*

At the trial of an indictment charging manslaughter, in which the defendant asserted self defense, the judge did not abuse her discretion in excluding the testimony of a witness regarding the victim's prior violent conduct, where, given that the already admitted evidence overwhelmingly indicated that the victim was the first aggressor, the testimony would have been cumulative and of only marginal value, outweighed by its potential to cause prejudice or confusion; further, this court concluded that counsel's inability to call the witness, despite having mentioned it in his opening argument, did not prejudice the defense, in light of the five-day expanse of the trial and the judge's curative instruction. [627-630, 631-634] McHugh, J., dissenting.

At the trial of an indictment charging manslaughter, the defendant was not entitled to an accident instruction, where no evidence indicated that the defendant's actions were unintentional. [630]

At a criminal trial, the judge properly excluded proferred personal opinion testimony about the defendant's character. [630-631]

INDICTMENT found and returned in the Superior Court Department on March 12, 2008.

The case was tried before *Regina L. Quinlan,* J.

*Kenneth I. Seiger* for the defendant.

*Helle Sachse,* Assistant District Attorney (*Ian Polumbaum,* Assistant District Attorney, with her) for the Commonwealth.

SIKORA, J. At the conclusion of a five-day trial, a Superior Court jury convicted Anthony Chambers of involuntary manslaughter, G. L. c. 265, § 13. On appeal, Chambers argues that

---

[1]Justice McHugh participated in the deliberation on this case and authored the dissenting opinion prior to his retirement.

the trial judge abused her discretion by exclusion of evidence of the victim's prior violent conduct. He asserts that the exclusion was additionally prejudicial because defense counsel, relying on the trial judge's initial decision to allow the testimony, told the jury in his opening argument that they would hear such evidence. He contends also that the trial judge wrongly refused to instruct the jury on the defense of accident, and incorrectly barred opinion testimony about his nonviolent character. For the following reasons, we affirm.

*Factual background.* The jury heard the following testimony. In early 2008, Chambers, James Ceurvels, and Edward Quiles, the victim, were living together in an apartment in the South End section of Boston. Ceurvels leased the apartment; he was allowing Chambers and Quiles to live there temporarily as his guests. All three men were drug users. Quiles and Chambers primarily used heroin, while Ceurvels preferred to smoke "crack" cocaine.

On the night of February 9, 2008, all three men were at the apartment. Quiles had a large package of heroin. Quiles and Chambers injected themselves with heroin frequently throughout the night and into the early morning of February 10. Ceurvels was playing with his computer and intermittently smoking crack cocaine throughout the night. The three eventually went to sleep around 4 A.M.

At about 9 A.M., Ceurvels woke up when he heard Quiles yelling about a gram of heroin that he could not find. Ceurvels shouted at Quiles to be quiet and then went back to sleep. Ceurvels awoke again at about 1:15 P.M. when he heard Quiles screaming at Chambers to find his heroin. Chambers, in a calm voice, insisted that he did not have Quiles's heroin. Quiles and Chambers were searching throughout the apartment for the package of heroin. Ceurvels left the apartment to search for cigarettes. After Ceurvels left the apartment, Chambers and Quiles got into a fight.

According to Chambers, Quiles woke him up and accused him of stealing the heroin.[2] Quiles had a knife and was threatening to stab Chambers. Quiles then telephoned his heroin dealer and

---

[2]Chambers did not testify at trial. However, after giving Miranda warnings, the police interrogated him at the station; the prosecution played a recording

told him to bring a gun to the apartment so that Quiles could shoot Chambers. In response, Chambers twice called 911 and told the dispatcher that Quiles was threatening him. While Chambers was on the phone with the dispatcher, Quiles punched him in the head and attacked him with the knife. Chambers grabbed Quiles's hand with the knife in it and tried to push the knife back towards Quiles. During the struggle, Chambers overpowered Quiles and the inverted knife stabbed into Quiles. Quiles fell onto a bed and stopped moving. Chambers grabbed his jacket and went downstairs to the lobby.

Ceurvels was the only witness to the confrontation between Chambers and Quiles. According to his testimony, he returned to the apartment ten minutes after leaving in search of cigarettes. At that moment, he saw the two men throwing punches at one another. They fought until both fell onto Ceurvels's bed. Chambers was on top of Quiles, with Quiles facing down on the bed. Quiles shouted, "You stabbed me, you bastard. You stabbed me." Frightened by the altercation, Ceurvels ran downstairs and told the concierge to call 911.

The police arrived shortly after Ceurvels reached the lobby. At this point, Chambers was heading out of the building. The first responding officer walked into the lobby as Chambers was on his way out. The concierge told the officer to pursue Chambers. The officer followed Chambers out of the building and eventually stopped him on the sidewalk near the building.

More officers arrived on the scene. Three of them went up to the apartment. They found Quiles lying on the bed. He was unresponsive and had a large pool of blood under his head and neck. Emergency personnel arrived at the apartment shortly after the officers. They attempted to help Quiles but soon concluded that he was dead. Upon further investigation of the apartment, officers discovered the metal blade of a steak knife on the floor next to the bed where Quiles had died.

The medical examiner conducted an autopsy. She testified that Quiles had a significant stab wound to the upper left side of his body, where the chest meets the neck. This stab wound went from the front to the back of the body and had a downward

of the interrogation for the jury. The prosecution also provided the jury with a transcript of the interrogation to assist them as they listened to the recording.

path, slightly from left to right. This wound had severed the carotid and subclavian arteries. It had penetrated the chest cavity and ended in the back portion of the left chest cavity between the second and third ribs. Quiles had received a second smaller wound to the front right side of his neck, as well as two small bruises on his face. The medical examiner opined that the knife blade found next to the bed was consistent with an instrument capable of causing the stab wounds. She concluded that Quiles's death had resulted from the stab wound that severed the carotid and subclavian arteries.

The Commonwealth charged Chambers with manslaughter. Before trial, defense counsel notified the prosecution that he intended to introduce evidence of Quiles's prior violent conduct to show that Quiles was the first aggressor. Defense counsel planned to call a witness who would testify that, about twenty-one months earlier in another section of Boston, Quiles, with five or six other men, had assaulted him in his car and taken his wallet and telephone. The prosecution filed a motion in limine to exclude this evidence. The trial judge initially denied the motion. In reliance on the ruling, defense counsel told the jury in his opening statement that a witness would testify about an unrelated incident in which Quiles had violently attacked him. However, later in the trial, the judge reversed her decision and excluded the witness. She reasoned that testimony of Quiles's prior violent conduct was no longer admissible because the Commonwealth's evidence had already established that Quiles was the first aggressor. Defense counsel asked the judge to explain to the jury that the promised witness would not appear because the evidence now established Quiles as the first aggressor. Counsel asked the judge also to instruct the jury that they must "accept as fact that the decedent was the first aggressor." The judge denied counsel's requests for these instructions.

*Discussion.* 1. *Admissibility of* Adjutant *evidence.* Criminal defendants who assert self-defense may seek "to admit evidence of specific acts of prior violent conduct that the victim is reasonably alleged to have initiated" if "the identity of the first aggressor is in dispute." *Commonwealth* v. *Adjutant*, 443 Mass. 649, 664 (2005) (*Adjutant* evidence). "It is for the trial judge to evaluate the proffered evidence's probative value and admit so

much of that evidence as is noncumulative and relevant to the defendant's self-defense claim." *Id.* at 663. "[D]ecisions of trial judges to admit or exclude such evidence . . . will be upheld unless we find an abuse of discretion." *Id.* at 663 n.18. See Mass. G. Evid. §§ 404(a)(2)(B), 405 (2011).

The trial judge did not abuse her discretion in the present case. The evidence overwhelmingly indicated that Quiles was the first aggressor. Ceurvels testified that Quiles was yelling at Chambers and demanding that he find Quiles's heroin. Ceurvels described Quiles as "agitated" and Chambers as "pretty mild." Just prior to the fight between Chambers and Quiles, Chambers called 911 and reported that Quiles was threatening to kill him. In his statement to the police, Chambers told the interrogating detectives that Quiles had asked his heroin dealer to bring him a gun so that he could kill Chambers. According to Chambers, Quiles punched him in the head while he was on the telephone with the 911 dispatcher, and Quiles then pulled out a knife and tried to stab him. The recording of the 911 call partially corroborates this version of events; it contains sounds indicating that Quiles had attacked Chambers during the call.

Amid this evidence, testimony of Quiles's prior violent conduct would have been cumulative and of only marginal value. See *Commonwealth* v. *Gaynor*, 73 Mass. App. Ct. 71, 75 (2008) (holding that trial judge's exclusion of *Adjutant* evidence was proper because victim had admitted that he was first aggressor). Further, such testimony could have prejudiced the jurors against Quiles and confused them as to the ultimate issues in the case. See *Adjutant, supra* at 662-663 (acknowledging that introduction of victim's prior instances of violent conduct may result in confusion and prejudice toward victim, and requiring judges to weigh these factors against probative value of evidence). The trial judge did not abuse her discretion. Her assessment that the potential of the testimony for prejudice or confusion outweighed its additional probative value was reasonable.[3]

---

[3]A party claiming "an abuse of . . . discretion assumes a heavy burden . . . [and must establish] that no conscientious judge, acting intelligently, could honestly have taken the view expressed by him." *Commonwealth* v. *Bys*, 370 Mass. 350, 361 (1976) (quotations and citation omitted). *Commonwealth* v. *Medeiros*, 395 Mass. 336, 351 (1985) (same language).

2. *Counsel's inability to call the witness referenced in opening statement.* Chambers alternatively argues that, even if the trial judge's exclusion of the *Adjutant* evidence were proper, the decision prejudiced his defense because defense counsel, in his opening statement, had promised it to the jury. In counsel's opening, he mentioned only briefly that he would be calling a witness to testify to Quiles's prior violent conduct.[4] He focused his opening on the evidence related to the fight between Quiles and Chambers. See United States *vs.* Patwardhan, U.S. Dist. Ct., No. ED CR 08-00172 (C.D. Cal. July 18, 2009) (no prejudice resulted from counsel's inability to call promised witness because reference to witness's anticipated testimony comprised only small part of counsel's opening statement), aff'd, U.S. Ct. App., No. 09-50487 (9th Cir. Mar. 18, 2011). Contrast *United States* v. *Gonzalez-Maldonado*, 115 F.3d 9, 14-15 (1st Cir. 1997) (reversing defendant's conviction where defense counsel in his opening statement promised "critical" testimony from expert witness but did not produce witness by reason of trial judge's changed ruling). The expanse of the trial is pertinent. Here it lasted five days, so that counsel's opening statement was not fresh in the jury's mind when they began deliberations. See *Yeboah-Sefah* v. *Ficco*, 556 F.3d 53, 78 (1st Cir.), cert. denied, 130 S. Ct. 639 (2009) (no prejudice resulted from counsel's failure to call promised witness because opening statement was made six days before end of trial). Contrast *Anderson* v. *Butler*, 858 F.2d 16, 17 (1st Cir. 1988) (finding prejudice where jury began deliberations day after counsel promised to present expert testimony that he never produced).

In addition, the trial judge explained to the jury that opening statements were not evidence and instructed them not to "speculate on why certain witnesses were called and others were not." See Patwardhan, *supra* (instructions that opening statements were not evidence alleviated any prejudice resulting from counsel's

---

[4]Defense counsel's reference was as follows.

"But you are going to hear evidence that [Quiles] was capable of unprovoked violence. And you are going to hear that from someone who otherwise has absolutely nothing to do with this case. The anti-Chambers, the anti-Quiles, the nice young kid who just happened to be in the wrong place at the wrong time and was victimized by the deceased in this case. And he'll come in here . . . and he'll tell you about it."

inability to follow through on promise to call expert witness). In light of these factors, we cannot conclude that counsel's inability to call this witness prejudiced Chambers's defense.

Finally, the trial judge would have risked invasion of the fact-finding province of the jury if she had used the defendant's proposed curative instruction because it *required* the jury to find that Quiles was the first aggressor. See *Commonwealth* v. *Cote*, 5 Mass. App. Ct. 365, 369 (1977) ("It is . . . improper for a judge to . . . direct what inferences the jury should draw from certain evidence").

3. *Accident instruction.* A defendant is entitled to an instruction on accident if the evidence, viewed in the light most favorable to the defendant, "fairly raises the possibility of accident." *Commonwealth* v. *Power-Koch*, 69 Mass. App. Ct. 735, 737 (2007), quoting from *Commonwealth* v. *Jewett*, 442 Mass. 356, 370 (2004). An accident functions as a defense to involuntary manslaughter if it is an "unintentional event occurring through inadvertence, mistake, or negligence." *Commonwealth* v. *Figueroa*, 56 Mass. App. Ct. 641, 650 (2002). In contrast, an accident, when used as "a label for the unintended consequences of a defendant's act," is not a defense to involuntary manslaughter. *Id.* at 648.

Here, no evidence indicated that Chambers's actions were unintentional. He made numerous statements to the police indicating that he did not intend to stab the victim mortally. However, for assessment of an accident defense to involuntary manslaughter, the critical focus centers on the intent to commit the act, not the intent to bring about the consequences of the act. Throughout Chambers's description of the fight with the victim, he never claimed to have pushed the knife unintentionally back toward Quiles. In the absence of such unintentional conduct, Chambers was not entitled to an accident instruction. Contrast *Power-Koch, supra* at 738 (holding that defendant was entitled to accident instruction where he claimed that he had unintentionally pulled trigger on gun, and thereby shot his friend). Finally, the presence of evidence of intentional conduct also militated against an accident instruction. The autopsy showed two knife wounds, one to each side of the victim's neck.

4. *Admissibility of opinion testimony about Chambers's*

*character.* "In a criminal proceeding, the accused may offer evidence of a pertinent trait in reputation form only . . . ." Mass. G. Evid. § 404(a)(1). See *Commonwealth* v. *Walker*, 442 Mass. 185, 198 (2004) ("[W]hile evidence of a defendant's general reputation in his community or at his workplace is admissible, evidence in the form of private opinions is not"). If the trial judge had allowed Ceurvels to testify about Chambers's character, he would have testified about his own personal opinion of Chambers's character, not about Chambers's reputation in the general community. This form of character evidence is clearly inadmissible. The trial judge correctly excluded it.

5. *Dissenter's concerns.* We have weighed carefully the reasoning of our dissenting colleague: that the judge abused her discretion by ultimate exclusion of the defendant's proposed *Adjutant* witness; and that the prosecutor unfairly exploited that exclusion in closing argument and thereby infected the trial with reversible error. For the following reasons, we cannot agree.

Several important preliminary points are undisputed. First, the prosecutor made no reference whatsoever to the excluded witness throughout his closing. Second, the judge correctly instructed the jury not to speculate about the absence of any originally proposed witness. We assume that a jury obey a judge's instruction. *Commonwealth* v. *Watkins*, 425 Mass. 830, 840 (1997). *Commonwealth* v. *Degro*, 432 Mass. 319, 328 (2000). That assumption operates realistically in the present circumstances in which defense counsel's reference to such a witness in an opening statement was brief and general and in which substantial trial time and abundant direct evidence of the specific circumstances of the homicide superseded the reference.

More importantly, the portrayal of the prosecutor's closing as a "blistering" exploitation of the *Adjutant* ruling, *post* at 636, does not stand up under inspection. Defense counsel emphasized at the beginning of his closing argument that "the core of this case is self-defense." After a vigorous interpretation of the evidence favorable to the defendant, he concluded that the fatal episode "sadly is what happens, and clearly that's not a crime, it's self-defense."

The prosecutor had naturally anticipated that argument. He began his closing with the acknowledgment that the Com-

monwealth carried the burden of proof beyond a reasonable doubt of at least one of three negatives: (1) that the defendant Chambers had not reasonably feared death or serious bodily injury from the victim Quiles; (2) that the defendant had not exhausted the alternatives to deadly force, such as retreat; or (3) that he had not used merely the force necessary in the circumstances. That accurate statement of the law specifically anticipated the judge's instructions.[5] The prosecutor proceeded to argue the evidence under each of those requirements. As to the first, he contended that the Commonwealth had disproved "any claim of the level of fear on [the defendant's] part that would justify the use of deadly force against another human being." The use of the words "level of fear" is significant and undisputed by the dissenting opinion. At no point in closing argument did the prosecutor deviate from the black-letter doctrine of the elements of self-defense and of the imposition of the burden of disproof upon the Commonwealth. The governing law, then, fully allowed the prosecutor to argue from the evidence that Quiles's aggression did not reach the level of intimidation necessary to justify his mortal stabbing by the defendant as either a matter of reasonably experienced fear (first element of self-defense) or proportionate force (third element). At no point in the closing did the prosecutor refer to the defendant as the first aggressor. His main contention was that the defendant's station house description of Quiles as a lethal intimidator was not credible.

Yet the dissenting opinion, *post* at 636, condemns the argument for "clearly insinuating that the defendant was, indeed, the initial aggressor."[6] However the more specific and determinative issue is which combatant first aggressed with the deadly

---

[5] See, e.g., *Commonwealth* v. *Roberts*, 433 Mass. 45, 56 (2000), and cases cited (three elements); *Commonwealth* v. *Williams*, 450 Mass. 879, 885 n.3 (2008) (Commonwealth's burden of disproof).

The judge covered the three elements and the concept of proving a negative or disproof. She did not involve the concept of "first aggressor." At the close of the instruction, neither side requested an additional "first aggressor" elaboration.

[6] To the same effect, it criticizes the judge's denial of an instruction that the defendant was not the first aggressor because it "permitted the Commonwealth to spend its entire summation telling the jury that the victim engaged in no aggression for the defendant to fear." *Post* at 638. A more calibrated description

instrument of the knife. Any insinuation upon that point inhered in the evidence and in the controlling doctrine, and not in any fault of the judge or the prosecutor. The jury heard evidence from which they could have attributed first use of the knife to either man but final excessive use of the knife only to the defendant.

Ceurvels testified that Quiles blamed the defendant for the disappearance of his (Quiles's) heroin. In his recorded station house interrogation, the defendant claimed that Quiles had approached him with the knife. The jury also heard evidence undermining the defendant's credibility and placing the knife exclusively in the defendant's hands. Ceurvels, a friend of the defendant for almost five years, testified that he saw the defendant atop Quiles, who was laying face down, and heard Quiles shout that the defendant had stabbed him. At the station house, the defendant stated that he had stabbed Quiles once in the midsection. However, the autopsy established two neck wounds, one catastrophic and fatal.

In these circumstances, the judge properly left the issue of first aggressor and ultimate wrongdoer in its proper location: the deliberation of the jury upon the totality of the evidence.[7] The evidence permitted the jury to find Quiles as an initiator of threat or combat, but not so intimidating an aggressor (not one creating a "level of fear") as to justify the fatal stabbing by Chambers, especially if they disbelieved the defendant's station house assertion that Quiles had attacked him with a knife. In short, the jury could have found that the Commonwealth had proved beyond a reasonable doubt that the defendant lacked the degree of reasonable fear contemplated by the first element of

would be that the prosecutor urged the jury to disbelieve the defendant's account of a degree of reasonable fear justifying the use of deadly force.

[7]A strong connotation of the dissenting opinion is that, once the judge excluded the *Adjutant* witness, she owed the defendant a jury instruction effectively establishing the victim as the first aggressor. If that determination of fact "went directly to the heart of the case's central dispute" as the dissent asserts, post at 637, quoting from *Adjutant*, 443 Mass. at 666, it belonged to the jury as a finding, and not to the judge as a ruling. Such an instruction would constitute an exceptional invasion of the jury box, especially if first aggressor status did not resolve the disputed possession of a knife or the use of excessive defensive force. The judge prudently declined to convert from the role of evidentiary gate keeper to the finder of material fact.

self-defense or that he had acted with force in excess of the degree allowed by the third element.[8]

Finally, we bear in mind that the *Adjutant* criterion is an evidentiary license entrusted to the sound discretion of trial judges.[9] We must measure the effect of an *Adjutant* ruling realistically amid the perspective of the entire evidence submitted at trial. In this instance we assess the consequence of the exclusion of one incident separated from the event confronting the jury by time (twenty-one months), place (another section of the city), personnel (five or six joint venturers), and circumstances (the absence of drug ingestion and weapons). The case at trial presented detailed evidence of eighteen hours of close-quartered and drug-soaked friction culminating in a homicide, including eyewitness testimony of a fatal struggle and forensic evidence of the cause of death. In the circumstances, we do not believe that the *Adjutant* ruling can serve as an archimedean lever long enough and strong enough to upend a conviction grounded in firm and direct evidence.

*Judgment affirmed.*


McHugh, J. (dissenting in part). I respectfully dissent because I cannot agree with the majority that, as the case unfolded, the excluded testimony of the victim's prior violent conduct was either cumulative or marginal.

After a voir dire hearing during which she heard testimony from the defendant's proposed witness, the judge, without objection from the Commonwealth, made a pretrial ruling that evidence of the victim's earlier assault and robbery of the defendant's proposed witness was admissible on the first aggressor issue.

---

[8]The forensic evidence of the neck wounds powerfully supported a finding of excessive force.

[9]The *Adjutant* rule is relatively new. As the present appeal illustrates, it can present challenging questions of degree to the judge before and during trial. Proposed evidence of a victim's prior violent conduct may involve incidents remote and disparate from the criminal acts charged at trial. Perhaps one lesson from this case is that, in close calls requiring further development of the evidence, the judge might prohibit defense counsel from promising the appearance of an *Adjutant* witness to the jury as part of an opening statement.

See *Commonwealth* v. *Adjutant*, 443 Mass. 649, 664 (2005) (specific acts of victim's prior violent conduct may be admitted to support defendant's claim of self-defense). When the trial began, the Commonwealth's opening statement strongly suggested that the victim was not the first aggressor. In response, and relying on the pretrial ruling, defense counsel's opening promised the jury that a disinterested witness would "come in here on probably Monday, maybe Tuesday, depending upon the pace of things," to show the jurors that the victim was "capable of unprovoked violence" and hence likely the first aggressor. Far from a fleeting reference, defense counsel made the promise toward the end of his opening as the capstone of his assertions that the jurors would hear evidence warranting an acquittal.[1]

On the fourth day of trial, however, the judge entered an order stating that "upon reconsideration sua sponte [the] court excludes [the] so-called '*Adjutant* evidence' because the identity of the first aggressor is not a live issue at trial. There is no evidence the defendant was the first aggressor."[2] As a result, the witness that the defense had promised was barred from testifying.

With the record in that state, the defendant requested an instruction to the effect that the defendant was not the first aggressor and that the testimony he had promised in the opening was irrelevant as a matter of law.[3] The judge denied the request, stating, in effect, that there was no evidence one way or the

---

[1]Contrast *Yeboah-Sefah* v. *Ficco*, 556 F.3d 53, 76, 78 (1st Cir.), cert. denied, 130 S. Ct. 639 (2009) (general promise that "both '[p]sychologists and psychiatrists' would testify" was not "specific, significant and dramatic promise"); United States *vs.* Patwardhan, U.S. Dist. Ct., No. ED CR 08-00172 (C.D. Cal. July 18, 2009) (prejudice from opening statement was limited because defense counsel's reference to evidence was "very brief mention amongst dozens of other subjects," taking up only eleven lines of twenty-three page transcribed opening, and *Adjutant* evidence was provisionally admitted subject to foundation that counsel failed to provide), aff'd, U.S. Ct. App., No. 09-50487 (9th Cir. Mar. 18, 2011).

[2]The judge's reversal was made in response to the Commonwealth's motion for an *Adjutant* instruction, which is designed to protect the Commonwealth, not the defendant, see *Commonwealth* v. *Sommer*, 77 Mass. App. Ct. 907, 908 (2010), and for limitations on — but not exclusion of — the *Adjutant* testimony.

[3]The requested instruction stated as follows:

"You recall that in his opening [defense counsel] indicated that he would produce a witness to testify about certain prior conduct of the

other on the first aggressor issue, though there was testimony from the defendant that he had seen the victim "rough up" other people. With the door thus opened, the Commonwealth in summation launched into a blistering attack on the defendant's claim that he inflicted the fatal wound in response to the victim's assault, clearly insinuating that the defendant was, indeed, the initial aggressor.

Though, as the majority correctly states, the judge has the discretion to weigh the probative value of so-called *Adjutant* evidence against its prejudicial effect, *Adjutant, supra* at 663-664, the record does not reveal that is what ultimately happened here. To be sure, in first deciding to allow testimony by the victim of the assault and robbery, the judge impliedly ruled that the balance between probative value and prejudicial impact tipped in favor of admitting the evidence. But when the judge altered her ruling in the middle of the trial, she did so not on the ground that the evidence was insufficiently probative but on the ground either that the defendant had so clearly won the first aggressor contest that he did not need the evidence and would gain nothing from its admission or on the ground that the Commonwealth had not introduced any evidence suggesting that the defendant was the first aggressor.[4]

---

victim . . . . That testimony would have been admissible if there was a question in the case of who was the first aggressor. It is a trial lawyer's job to consider all possibilities and therefore, if the question of who was the first aggressor was a live issue I would have allowed [defense counsel] to produce that witness.

"However, based upon the evidence actually submitted I have ruled that there is no question that the victim was the first aggressor. There is no evidence that the defendant was the first aggressor, and [you] must accept as fact that the decedent was the first aggressor.

"Therefore, I have ruled as well that the calling of such a witness is unnecessary."

[4] The judge explained the basis for her ruling in the course of the following colloquy:

THE COURT:          "Well, let me ask you this. Under pre-*Adjutant* and maybe, [defense counsel], you would be the better one to answer this. Is there any indication in the evidence that you have, or intend to offer, that the defendant knew of the [assault and robbery] incident

From opening through closing, however, an essential component of the Commonwealth's case was its claim that the victim never engaged in any acts that put the defendant in fear for his safety. The judge barred the only outside evidence the defendant had to bolster his claim that the victim was the first aggressor. That left the defendant with testimony about his own observations, testimony the Commonwealth dispatched by arguing to the jury that it "is only useful to you if you can trust it. And this information by the defendant where, on second thought, . . . he has seen [the victim] eff people up, that's not worth anything to you because you can't trust him."

*Adjutant*, 443 Mass. at 664, holds that "where the identity of the first aggressor is in dispute and the victim has a history of violence . . . the trial judge has the discretion to admit evidence of specific acts of prior violent conduct that the victim is reasonably alleged to have initiated, to support the defendant's claim of self-defense." The evidence excluded here, like that proffered in *Adjutant*, "went directly to the heart of the case's central dispute — whether [the victim] was the initial aggressor in his final altercation with [the defendant]." *Id.* at 666. The posture of the case contrasts starkly with *Commonwealth* v. *Gaynor*, relied on by the majority, where the victim conceded his role as the first aggressor. *Commonwealth* v. *Gaynor*, 73 Mass. App. Ct. 71, 75 (2008) (excluding *Adjutant* evidence). That concession eliminated any prejudice from the exclusion of *Adjutant* evidence because "the identity of the first aggressor was irrelevant to the jury's consideration of the case as submitted to them by the judge." *Id.* at 76. Moreover, the judge in

---

[about which the defendant's witness would testify] and what it would produce?"

DEFENSE COUNSEL: "He knew of that particular incident? No way."

THE COURT: "All right. So under pre-*Adjutant* that would be the condition precedent."

DEFENSE COUNSEL: "Correct."

THE COURT: "And given the condition precedent to *Adjutant*-type evidence not being present, which is the basis of my ruling, then I find no evidence of the deceased not being the first aggressor, if you will."

*Gaynor* consistently denied the defendant's motion for *Adjutant* evidence, rather than initially allowing it. See *id.* at 75.

Here, the judge first allowed the evidence, then excluded it after counsel promised to provide it, then declined the defendant's request for an instruction that he was not the first aggressor and, finally, permitted the Commonwealth to spend its entire summation telling the jury that the victim engaged in no aggression for the defendant to fear. In that context, midtrial exclusion of the evidence created a risk of unfair prejudice that the Commonwealth exploited to full effect.

I would reverse.