COMMONWEALTH vs. ANTHONY CHAMBERS.

Suffolk. February 5, 2013. - June 13, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Homicide. Self-Defense. Evidence,* Self-defense, Prior violent conduct, Opinion, Reputation. *Practice, Criminal,* Opening statement, Instructions to jury.

During the trial of an indictment charging manslaughter, the judge erred in reversing, sua sponte, her pretrial ruling that the defendant could offer evidence that the victim had participated in a violent assault of a third person twenty-one months before the victim died, in support of the defendant's claim that the victim had been the first aggressor in the incident that resulted in the victim's death, where such evidence is admissible in circumstances in which there is no dispute that the victim provoked or initiated a nondeadly assault, but a dispute exists whether the victim was the first to use or threaten deadly force [527-531]; further, the judge's error was prejudicial, given that the reversal of the pretrial ruling rendered the defendant unable to fulfil a promise made to the jury in his opening statement (in reliance on the pretrial ruling) that he would offer evidence of the victim's prior act of "unprovoked violence," and the judge did not explain to the jury why the defendant could not keep that promise [531-536].
Statement at the retrial of an indictment charging the defendant with manslaughter, a witness's personal opinion of the defendant's nonviolent character would not be admissible. [536-537]

INDICTMENT found and returned in the Superior Court Department on March 12, 2008.

The case was tried before *Regina L. Quinlan*, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Kenneth I. Seiger* for the defendant.

*Ian Polumbaum*, Assistant District Attorney, for the Commonwealth.

GANTS, J. The defendant was convicted by a Superior Court jury of the involuntary manslaughter of Edward Quiles. There was no dispute that the defendant had stabbed the victim to death, but the defendant contended that he did so in self-defense.

Before trial, the judge ruled that, under our common-law rule of evidence established in *Commonwealth* v. *Adjutant*, 443 Mass. 649 (2005) (*Adjutant*), the defendant could offer evidence that the victim participated in a violent assault of a third person twenty-one months before the victim died in support of the defendant's claim that the victim was the first aggressor in the incident that resulted in the victim's death. In his opening statement, defense counsel promised to offer this evidence, but later in the trial the judge, sua sponte, reversed her ruling and found that this evidence was not admissible because there was no dispute that the victim was the first aggressor. The judge additionally refused defense counsel's request to inform the jury that she found the promised evidence of the victim's prior violent act inadmissible because there was no evidence that the defendant was the first aggressor. The primary issue on appeal is whether the judge erred in excluding this evidence on this ground where the evidence indicated that the victim was plainly the first to provoke a nondeadly altercation but where it was hotly disputed whether the defendant or the victim was the first to grab the knife that escalated the nondeadly conflict into a deadly one.

We conclude that a judge in her discretion may admit so-called "*Adjutant* evidence"[1] where there is a dispute at trial as to who threatened or struck the first blow *or* as to who initiated the threat or use of deadly force. The judge here exercised her discretion to admit the proffered *Adjutant* evidence if the identity of the first aggressor was in dispute, but mistakenly understood that *Adjutant* evidence was admissible only where there was a dispute as to who threatened or struck the first blow. We conclude that this mistake infected her ruling, and caused evidence to be excluded that in her discretion otherwise would have been

---

[1] *Adjutant* evidence constitutes evidence of "specific acts of prior violent conduct that the victim is reasonably alleged to have initiated," *Commonwealth* v. *Adjutant*, 443 Mass. 649, 664 (2005) (*Adjutant*), offered by the defendant "for the limited purpose of supporting the defendant's self-defense claim that the victim was the first aggressor." *Id.* at 660. In *Commonwealth* v. *Morales*, 464 Mass. 302, 303 (2013), we held that, where a defendant offers *Adjutant* evidence, the Commonwealth may offer evidence of the defendant's prior violent acts, provided that the Commonwealth gives the defendant advance notice of its intent to offer such evidence "and the trial judge determines that introduction of such evidence is more probative of its intended purpose than prejudicial to the defendant."

admitted. We also conclude that this mistake, when considered with defense counsel's unfulfilled promise of the *Adjutant* evidence to the jury, resulted in prejudice that requires the conviction to be vacated and the case to be remanded for a new trial.

*Background.* In light of the issues on appeal, we focus our summary of the facts on the evidence presented at trial as to the identity of the first aggressor. On February 10, 2008, the defendant was staying in a small apartment in Boston with James Ceurvels and Edward Quiles. All three men were regular drug users; Ceurvels used "crack" cocaine, while the defendant and Quiles primarily used heroin. Prior to the night in question, Ceurvels had never seen any conflicts or problems arise between the defendant and Quiles.

Other than the defendant, Ceurvels is the only living percipient witness to the altercation between Quiles and the defendant that led to Quiles's death. Ceurvels testified that, sometime after 9 P.M. on February 9, the defendant and Quiles showed him a golf ball-sized bag of heroin, which Ceurvels described as the most heroin he had ever seen at one time in one place. Over the course of the night, the defendant and Quiles went into the apartment's bathroom several times for approximately thirty to forty-five minutes at a time to inject heroin. All three went to sleep at around 4 A.M. on February 10.

Sometime in the morning, Ceurvels awoke when Quiles yelled about "a gram" that he could not find. He told Quiles to shut up, the apartment got quiet again, and Ceurvels went back to sleep. Ceurvels did not know whether the defendant participated in that conversation.

Sometime in the early afternoon, Ceurvels was again awakened by Quiles, who Ceurvels described as being "[p]retty agitated." Ceurvels overheard Quiles telling the defendant, "Find my shit. Where's my shit?" Ceurvels testified that he heard the defendant respond in a "[p]retty mild" tone of voice, "I don't have your shit. I'll help you find your shit. Why would I take your shit?" A similar exchange continued over and over for approximately five minutes, along with "[s]tuff moving around, doors opening and closing." When Ceurvels physically got up out of his bed, he observed Quiles and the defendant looking all over the apartment, and he understood them to be looking for the

large bag of heroin. At this time, he did not observe any physical contact between them. Ceurvels then left the apartment to scrounge outside for partially smoked cigarettes that still had some tobacco in them.

After approximately ten minutes, Ceurvels returned to his apartment and saw Quiles and the defendant "having an all-out brawl, fistfight, wrestling brawl." He testified that he observed "arms swinging, both arms swinging. And it looked like a wrestling match after that . . . and then they fell . . . out of my view and onto my bed." He testified that he heard his bed and chair getting kicked "from the feet hitting the chair," along with Quiles screaming at the top of his lungs. Before he got far enough into the apartment to regain his view of the combatants, he observed a large amount of blood on the floor that had not been there when he left. When he advanced far enough to see them again, Ceurvels observed the defendant on top of Quiles, with Quiles face down on the bed and with the defendant's arm over Quiles's head and back. At this point, Ceurvels heard Quiles say, "You stabbed me, you bastard. You stabbed me." After this, Ceurvels turned around immediately and ran out of the apartment. Ceurvels never saw any weapon.

After leaving the apartment, Ceurvels went downstairs to the building's concierge and asked him to call the police and an ambulance. Officer Renisha Silva of the Boston police arrived, and as she entered the building, Ceurvels observed that the defendant left the building, passed Officer Silva, and said, "I'm out of here, dude. I'm bouncing." The concierge told Officer Silva, "That's the guy," and she chased after him. Officer Silva testified that she asked the defendant to show his hands, and the defendant ignored the instruction and kept walking away until Officer Silva pointed her gun at him and told him to stop and get down on the ground.

Ceurvels remained by the front door to the apartment building and soon witnessed the arrival of Juan Velasquez, who nodded his head at Ceurvels, but did not enter the apartment building. Ceurvels recognized the person later identified by the police as Velasquez because Quiles had brought Velasquez to Ceurvels's apartment two weeks earlier. After Velasquez looked at one of the police vehicles that had arrived on the scene, he took off running and was subsequently apprehended.

After Velasquez was detained, Officer Frank Nogueira knocked on the door of the apartment but no one answered. He saw that the door was unlocked but could only open it slightly because something was blocking it from inside the apartment. He forced the door open, knocking over a metal cart inside the apartment. He found the lifeless victim lying face down on the bed, with a three-inch long laceration in his neck. He saw on the floor the metal blade of a steak knife that had broken off its handle, and a detective later found the knife handle on a table nearby.

The forensic pathologist who conducted the autopsy, Dr. Faryl Sandler, found a stab wound on the left side of Quiles's neck that punctured the left carotid and subclavian arteries, and ended in Quiles's chest cavity, which caused his death, and an incised wound on the right side of his neck with a length of one and one-eighth inches and a depth of one-eighth inch. The knife collected at the scene was consistent with both wounds on Quiles's neck. Dr. Sandler testified that a person with his carotid artery cut could remain conscious for a minute to a couple of minutes, then would start to lose consciousness due to the lack of oxygen to the brain, and would ultimately die within a couple of minutes if the artery were not repaired. There was also a small contusion on the left side of Quiles's forehead, an abrasion on the bridge of his nose, and a small abrasion on his left leg, but there were no wounds on his torso.

The defendant was brought to the police station, where Sergeant William E. Doogan provided him with Miranda warnings and proceeded to interrogate him about the incident. After Sergeant Doogan informed the defendant that he could refuse to have the interview recorded, the defendant said that he wanted the sergeant to stop recording, and the sergeant complied. At trial, Sergeant Doogan testified that, while the recorder was off, the defendant stated that Quiles "was crazy on drugs and was accusing [the defendant] of having stolen his drugs" before Quiles attacked him. "He defended himself and turned the knife back in on [Quiles]." While the recorder was off, the defendant also stated that (1) "[Quiles] had the knife. He got it out of the kitchen"; (2) "[Quiles] had called [Velasquez] to come down and shoot [the defendant]"; and (3) Quiles had "assaulted him" by "punch[ing] him in the head" while he was calling the

police. Eventually, Sergeant Doogan raised the issue of recording the interview again, the defendant agreed to have the rest of the interview recorded, and the recorder was turned back on.

During the recorded portion of the interrogation, the defendant said that, in addition to using heroin and cocaine, Quiles had taken seven to ten pills of Klonopin earlier in the evening. He stated that he, Ceurvels, and Quiles were all awake until approximately 6 or 6:30 A.M. on February 10, when the defendant left the apartment to go to a McDonald's restaurant to bring back breakfast for himself and Quiles before they went to sleep. At some time after the defendant returned, Quiles woke the defendant up by accusing him of taking Quiles's "gram." The defendant then grabbed his coat and left the apartment but stayed in the building to let Quiles cool off. Approximately one hour later, the defendant returned to the apartment and went back to sleep.

Several hours later, according to the defendant, Quiles ripped off the defendant's coat, which the defendant had been using as a blanket, and said, "Fuck you, I'm gonna kill you, I'm gonna stab you, you took my dope and I know you did, you junkie motherfucker." Quiles then telephoned Velasquez, and he heard Quiles say "some Spanish stuff" and then, "Get over here, I wanna shoot this motherfucker, I wanna fill him full of holes. He took all my dope and . . . thinks I'm stupid."[2,3]

The defendant stated that Quiles would not let him go out the door to get away and blocked the doorway, telling the defendant, "You're not going nowhere, I'm fucking you up."

While Quiles was on the telephone with Velasquez, the defendant called 911 and, according to the tape recording of that telephone call, reported that he was being threatened by "some kid that's up in there in the apartment."[4] The defendant then

---

[2]The parties stipulated that, according to cellular telephone records, a call was placed from a telephone listed to Edward M. Quiles to a telephone in the name of Juan Velasquez at 1:26:51 P.M., and the duration of the call was 139 seconds.

[3]In the Commonwealth's closing argument, the prosecutor suggested that the defendant was lying when he stated that Quiles told Velasquez in English to come over and help shoot the defendant, because Ceurvels testified that Quiles and Velasquez only spoke Spanish to each other when he once saw them in his apartment.

[4]The parties stipulated that a call was placed from a telephone number in

called 911 again and reported that somebody was threatening to kill him. He said that Quiles, whom he stated that he knew only as "Red," was "flipping out." According to the defendant, when Quiles realized the defendant was calling the police, Quiles "tried to smack the phone," punched the defendant in the head, and said, "What are you fucking calling the police on me?" The defendant stated that Quiles was "just hysteric, going crazy," and that he was "scared to death."[5]

The defendant offered conflicting statements about how the knife entered the fray. In the beginning of the interrogation, the defendant stated that Quiles "went in the kitchen and grabbed a knife" and put it in his back pocket. Later, he stated that he actually could not say where the knife came from, "either the pocket or he already had it in his — I don't know, it happened so quick, sir." Regardless of where the knife came from, the defendant stated that Quiles "started swinging" at him, and because Quiles was a "younger guy," the defendant was over-powered.[6] Quiles tossed the defendant on the bed, tried to stab him, and then, according to the defendant: "That's when I pushed the thing back at his — with all my might to push it . . . back at him. His hand with the knife in it. . . . All my might to push it back at him." At another point in the interview, the defendant described the stabbing as follows: "He throws me and tried to stab me, . . . and I jerked his hand back the other way and I guess it hit his stomach or whatever, something like that, . . . because he fell and . . . I said, 'oh my God, what the' — I didn't know what to do." The defendant stated that he thought Quiles only got stabbed once, that it was in the stomach, and that he thought he only held the knife there "a second or so."

The defendant appealed his conviction, and the Appeals Court affirmed the judgment, with one justice dissenting. *Com-*

the account name of Tony Chambers to 911 at 1:28:23 P.M. which lasted for sixty-one seconds. Therefore, the defendant placed the first 911 call from his cellular telephone while Quiles was calling Velasquez.

[5]The parties stipulated that the second 911 call was made from the telephone number in the account name of Tony Chambers at 1:30:51 P.M. and continued for 156 seconds. Toward the end of the second 911 call, a voice other than the defendant's can be heard saying, "Get off the fucking phone," at which point the defendant stops responding to the 911 operator.

[6]The defendant was fifty-one years old; Quiles was twenty-eight years of age.

*monwealth* v. *Chambers*, 81 Mass. App. Ct. 624 (2012). We granted the defendant's application for further appellate review.

*Discussion.* 1. *Admissibility of evidence under* Adjutant. Prior to trial, defense counsel requested that the Commonwealth disclose evidence of specific acts of violence by the alleged victim. In response, the Commonwealth moved in limine to exclude "so-called *Adjutant* evidence" and requested that the judge conduct a voir dire of the potential witness Ismail Saasaa if the judge were considering allowing the defendant to offer *Adjutant* evidence of an assault and robbery of Saasaa in which Quiles allegedly participated. The judge conducted a voir dire, where Saasaa stated that he was assaulted and robbed by a group of individuals including Quiles in May, 2006, and the judge ruled that this evidence was admissible. However, on the fourth day of the five-day trial, after the Commonwealth had filed a motion requesting jury instructions regarding the anticipated *Adjutant* evidence, the judge reconsidered, sua sponte, her earlier ruling and precluded Saasaa from testifying "because the identity of the first aggressor [was] not a live issue at trial," noting that "[t]here is no evidence the defendant was the first aggressor."

We announced in *Adjutant, supra* at 664, that "where the identity of the first aggressor is in dispute and the victim has a history of violence, . . . the trial judge has the discretion to admit evidence of specific acts of prior violent conduct that the victim is reasonably alleged to have initiated, to support the defendant's claim of self-defense," regardless whether the defendant knew of the victim's prior violent acts. We held that such evidence "may be admitted as tending to prove that the victim and not the defendant was likely to have been the 'first aggressor' " because it may show "that the victim acted in conformance with his character for violence." *Id.* at 654. While in *Adjutant* we declared this evidence admissible where a defendant claims self-defense only to shed light on the disputed issue of who was the "first aggressor," we did not define the term "first aggressor." It is plain that the judge here understood that the "first aggressor" was the person who provoked or initiated the assault, and concluded that the proffered *Adjutant* evidence was not necessary because all of the evidence pointed to Quiles as the person who provoked or initiated the assault. We recognize

that the judge could reasonably have reached this understanding of the meaning of "first aggressor" from our case law, but we conclude that this definition is too narrow and take this opportunity to clarify the term's meaning.

In our common law, a criminal defendant who is found to have been the first aggressor loses the right to claim self-defense unless he "withdraws in good faith from the conflict and announces his intention to retire." *Commonwealth* v. *Maguire*, 375 Mass. 768, 772 (1978). See *Commonwealth* v. *Harris*, 464 Mass. 425, 435 (2013) (*Harris*), and cases cited. In this context, we have defined the first aggressor as "a person who provokes or initiates an assault," *Commonwealth* v. *Maguire, supra*; as "the person who initiates the fray," *Commonwealth* v. *Carrion*, 407 Mass. 263, 268 (1990); and as "a defendant who provokes or initiates an attack." *Commonwealth* v. *Rodriquez*, 461 Mass. 100, 110 (2011). In *Harris, supra* at 433-436 & n.12, we recognized that, even though such language appears in many of our decisions, a jury instruction providing that a "person who provokes or initiates an assault ordinarily cannot claim the right of self-defense . . . is potentially overbroad because it does not define what constitutes provocation of the type that results in the forfeiture of a self-defense claim," noting specifically that "the language does not differentiate between verbal and physical provocation."[7] Further, in our recently revised Model Jury Instructions on Homicide 28-29 & n.68 (2013), we addressed the potential overbreadth of our earlier definitions of "first aggressor" and clarified that, in the context of homicide, a defendant may lose the right to claim self-defense only if he "was the first to use or threaten deadly force."[8]

---

[7]We clarified in *Commonwealth* v. *Harris*, 464 Mass. 425, 435 n.12 (2013) that "conduct involving only the use of nonthreatening words will not be sufficient to qualify a defendant as a first aggressor."

[8]The model instruction provides:

> "The right of self-defense cannot be claimed by a defendant who was the first to use or threaten deadly force, because a defendant must have used or attempted to use all proper and reasonable means under the circumstances to avoid physical combat before resorting to the use of deadly force. A defendant who provokes or initiates such a confrontation must withdraw in good faith from the conflict and announce to the person (or persons) he provoked his intention to withdraw and end the confrontation without the use of force or additional force. For the

Where a defendant claims self-defense and there is a dispute of fact whether the defendant or the victim was the first aggressor, *Adjutant* evidence is admissible to help the jury determine what happened during the altercation. It is important to note that, although *Adjutant* evidence may assist a jury to determine whether the defendant has lost the right of self-defense, it is not limited to this purpose. In the *Adjutant* case, as in this case, the jury were not instructed that a first aggressor loses the right to claim self-defense, so we reasonably may infer that the contested evidence was not admitted for the purpose of addressing that issue. Rather, it was admitted for the broader purpose of giving the jury relevant information regarding the victim's prior acts of violence that may help them to evaluate the conflicting evidence, to arrive at the truth regarding the events that led to the victim's death, and ultimately to determine whether the prosecution has met its burden of proving that the defendant did not act in self-defense. See *Adjutant, supra* at 658-659 ("jury should have as complete a picture of the [often fatal] altercation as possible before deciding on the defendant's guilt"). See also *People* v. *Lynch*, 104 Ill. 2d 194, 200 (1984).

This is the first time that we have addressed whether *Adjutant* evidence is admissible where it is essentially undisputed that the victim provoked or initiated a nondeadly assault, but where it is disputed whether the defendant or the victim was the first to use or threaten deadly force.[9] Where a victim's prior act or

---

purpose of determining who attacked whom first in the altercation, you may consider evidence of the deceased's [and a third party acting together with the deceased's] past violent conduct, whether or not the defendant knew of it."

Model Jury Instructions on Homicide 28-29 & n.68 (2013).

[9]In *Adjutant, supra* at 650-652, the defendant testified that the victim attacked first by throwing her onto his bed *and* threatened deadly force first by arming himself with a crowbar, while the prosecutor offered evidence that the defendant had grabbed a knife before the victim had committed any assault against her. There was also a dispute as to what happened after the victim and the defendant had armed themselves. The defendant testified that, when the persons who had earlier driven her to the victim's apartment returned and kicked in the door to rescue her, the victim advanced on her with a crowbar and she stabbed him in self-defense. The prosecutor offered other evidence that, when the door was kicked open, the defendant moved toward the victim and stabbed him in the neck.

In *Commonwealth* v. *Pring-Wilson*, 448 Mass. 718, 734-735 (2007), another

acts of violence demonstrate a propensity for violence, we conclude that *Adjutant* evidence is as relevant to the issue of who initiated the use or threat of deadly force as it is to the issue of who initiated an earlier nondeadly assault, and such evidence may be admitted to assist the jury where *either* issue is in dispute, because the resolution of both issues may assist the jury in deciding whether the prosecution has met its burden of proving that the defendant did not act in self-defense. Here, the critical question in determining whether the Commonwealth proved that the defendant did not act in self-defense when he killed the victim was who first grabbed the kitchen knife that ultimately was the instrument of death, not who shouted first or who struck the first punch, because the grabbing of the knife was the act that transformed a relatively harmless fight among roommates into a deadly altercation. Therefore, in cases like this one, *Adjutant* evidence cannot serve its intended purpose if it is admissible only to help the fact finder determine who initially provoked the altercation rather than who unreasonably escalated it by initiating the use or threat of deadly force. While *Adjutant* evidence is clearly admissible in many cases to help determine who initiated or provoked a nondeadly assault, particularly in cases where no deadly force was ever threatened or used, it is equally admissible in homicide cases where, even if the initiator of the nondeadly assault is known, it is disputed whether the victim or the defendant was the first to use or threaten deadly force.

The judge here, after conducting a voir dire, impliedly determined that the probative value of Saasaa's proposed testimony in evaluating who was the first aggressor outweighed its potential prejudicial effect when she exercised her discretion to rule it admissible. See *Adjutant, supra* at 666 (judge retains discretion to determine whether probative value of evidence of prior violence outweighs prejudicial effect). Having made this finding, the judge erred in ruling that this evidence was no longer admissible because the identity of the first aggressor was "not a live issue at trial." Where the defendant was charged with man-

case where we discussed the admissibility of *Adjutant* evidence, the prosecution offered evidence that the defendant initiated the physical encounter *and* was the first to use or threaten deadly force, while the defendant testified that the victim and his friends initiated the physical encounter *and* quickly escalated the encounter by using deadly force themselves.

slaughter, and where the evidence was unclear as to which party first used or threatened deadly force, *Adjutant* evidence was still admissible for the purpose of helping the fact finder identify the first aggressor.[10,11]

2. *Defense attorney's broken promise.* Based on the judge's pretrial ruling that Saasaa's testimony would be admissible under *Adjutant*, defense counsel told the jury during his opening statement that they would hear from a witness about the victim's prior act "of unprovoked violence."[12] After the judge's sua sponte exclusion of this proffered *Adjutant* evidence, the defendant

---

[10]Because the judge's sole ground for ruling the evidence inadmissible was the absence of any dispute regarding the identity of the first aggressor, we do not consider whether she would have abused her discretion had she found the evidence inadmissible because its prejudicial effect outweighed its probative value.

[11]The defendant in his postarrest statement said that the victim made several verbal threats indicating that he intended to kill the defendant before the physical altercation began. However, the prosecutor, in both opening statement and closing argument, repeatedly attacked the credibility of the defendant's entire version of events, which was presented at trial solely through the defendant's statement. The prosecutor specifically argued in closing argument that "the defendant's version of what he heard [the victim] say on the phone to Velasquez is fabricated." Moreover, the Commonwealth's theory of the case was wholly inconsistent with the defendant's statement. The prosecutor told the jury in opening statement that the defendant was on trial "not because he's a victim, but because he got fed up with somebody in that apartment . . . , stabbed him in the neck with a steak knife and removed him from this Earth." The prosecutor repeated this theory in closing argument, stating that the defendant was "not the victim, nor a victim," and that "he killed a man, he tried to cover his tracks, and he lied, and lied and lied about it." When we consider the prosecutor's arguments, as well as the uncertainty as to how the knife entered the fray, we conclude that the identity of the individual who first used or threatened deadly force was in dispute when the judge rendered her ruling and when the case was submitted to the jury.

[12]Defense counsel told the jury:

> "Now, there's one fact, and as I told you probably the hardest part of my job is to speak ill of the deceased, and I apologize for that. But you are going to hear evidence that this young man was capable of unprovoked violence. And you are going to hear that from someone who otherwise has absolutely nothing to do with this case. The anti-Chambers, the anti-Quiles, the nice young kid who just happened to be in the wrong place at the wrong time and was victimized by the deceased in this case. And he'll come in here on probably Monday, maybe Tuesday, depending upon the pace of things, and he'll tell you about it. And he'll tell you the government knew because he turned him in. And he'll tell you how he identified him with the Boston police."

moved for reconsideration, arguing that the "inability to deliver upon a promise to a jury can destroy an attorney's credibility." The defendant suggested in that motion that the problem might be avoided if the judge were to provide the following curative instruction to the jury:

> "You recall that in his opening [defense counsel] indicated that he would produce a witness to testify about certain prior conduct of the victim . . . . That testimony would have been admissible if there was a question in the case of who was the first aggressor. It is a trial lawyer's job to consider all possibilities and therefore, if the question of who was the first aggressor was a live issue I would have allowed [defense counsel] to produce that witness.

> "However, based upon the evidence actually submitted I have ruled that there is no question that the victim was the first aggressor. There is no evidence that the defendant was the first aggressor, and [you] must accept as fact that the decedent was the first aggressor.

> "Therefore, I have ruled as well that the calling of such a witness is unnecessary."

Instead, the judge provided the following instruction:

> "Now, you remember at the beginning of the case I read off a list which was very long of witnesses and many, if not at least some of those witnesses, were not called. That happens in every case. As I said in the beginning, we do it out of an abundance of caution to let you know anyone who may be called as a witness. So you are not to speculate on why certain witnesses were called and others were not."

We have not previously had occasion to address whether it is prejudicial error for a judge, after ruling pretrial that certain evidence is admissible, to preclude counsel from introducing such evidence after counsel has already promised the jury that such evidence would be presented. We have, however, previously held that, in some circumstances, an attorney's "failure to produce evidence that counsel has predicted in an opening"

may constitute ineffective assistance of counsel. See *Commonwealth* v. *McMahon*, 443 Mass. 409, 425 (2005); *Commonwealth* v. *Duran*, 435 Mass. 97, 109 (2001). There is no contention here that defense counsel was ineffective for promising in opening statement to offer evidence that the judge had ruled admissible in a motion in limine. But the possibility that, in other circumstances, an unkept promise in an opening statement may deny a defendant his constitutional right to the effective assistance of counsel and create a substantial risk of a miscarriage of justice reflects our recognition that "failure to present critical evidence that has been announced in an opening statement can have drastic ramifications" for a defendant. *Commonwealth* v. *McMahon, supra.*

The United States Court of Appeals for the First Circuit addressed a similar claim in *United States* v. *Gonzalez-Maldonado*, 115 F.3d 9, 15 (1st Cir. 1997). There, "[h]aving obtained the assurance of the court that [an expert witness] would be allowed to testify, defense counsel stated as much to the jury. When the court later changed its mind and ruled that the expert would not be permitted to testify, defendants were unable to produce the promised testimony." *Id.* at 14-15. The court reasoned:

> "A defendant's opening statement prepares the jury to hear his case. If the defense fails to produce promised expert testimony that is critical to the defense strategy, a danger arises that the jury will presume that the expert is unwilling to testify and the defense is flawed. That the defendant should suffer this presumption because he relied on a prior ruling of the trial court that the same court later reversed, rather than because of poor judgment on the part of his own counsel, in no way changes the fact that the presumption formed in the minds of the jury is prejudicial. . . . [W]e find that promising to admit this important evidence and then failing to produce it is prejudicial as a matter of law in the circumstances of this case."

*Id.* at 15. See *Sleeper* v. *Spencer*, 510 F.3d 32, 41 (1st Cir. 2007), cert. denied, 553 U.S. 1098 (2008), citing *Anderson* v. *Butler*, 858 F.2d 16, 17 (1st Cir. 1988) ("breached promise to present specific evidence can injure because it invites speculation that the omitted evidence would have harmed an otherwise

viable defense"). But see *Yeboah-Sefah* v. *Ficco*, 556 F.3d 53, 78 (1st Cir.), cert. denied sub nom. *Yeboah-Sefah* v. *Russo*, 558 U.S. 1031 (2009) (fact that promise to jury was made "six days before the end of trial" weighs against finding of prejudice because promise could "hardly be considered contemporaneous with the jury's deliberations").

We conclude that, where the judge failed to explain to the jury why the defendant could not keep the promise he made in opening statement, the defendant was prejudiced by the judge's ruling that rendered the defendant unable to fulfil his promise to the jury that he would offer evidence of the victim's prior act "of unprovoked violence." The judge's admonition to the jury not to speculate as to why certain persons on the witness list were not called to testify did not adequately cure the prejudice. We recognize that defense counsel's promise of testimony regarding the victim's prior act of violence occurred three days before the jury commenced deliberations, but we also recognize that, considering the importance defense counsel placed on this testimony in his opening statement and the fact that the defendant rested without calling a single witness, it is likely that its absence did not go unnoticed by the jury.[13]

If a judge precludes important evidence that defense counsel, in reliance on the judge's pretrial ruling, promises the jury he will offer, the judge should offer to cure the resulting prejudice by instructing the jury that counsel's promise was based on her prior ruling, and that counsel's apparent failure was the result of the judge's own legal determination either that the promised evidence was not admissible or that the issue on which the evidence bore relevance had been decided as a matter of law and therefore need not be decided by the jury. If a judge is unwilling to cure the prejudice by explaining to the jury why they should not make any adverse inference from defense counsel's failure to keep his or her promise in opening statement, the

[13]The only evidence offered by the defendant consisted of a two-page medical report of the defendant, and two stipulations: (1) that Ceurvels's neighbor told the police that, at approximately 1:30 p.m. on the day in question, she heard "the tenant of [Ceurvels's apartment] make a noise that sounded like a scream, and she then heard banging on the wall"; and (2) that on February 11, 2008, the defendant appeared in court and was examined by a doctor who recommended he go through detoxification.

judge should avoid the prejudice by allowing the evidence to be heard by the jury. Here, the judge precluded the sole witness promised by the defendant from testifying without providing a sufficient explanation to the jury for the witness's absence.

The prejudice arising from this error added to the prejudice the defendant suffered from the judge's error in ruling that Saasaa's proffered testimony was inadmissible. Considering the prejudice arising from the two errors together, we cannot say with fair assurance that the errors "did not influence the jury, or had but very slight effect." *Commonwealth* v. *Vinnie*, 428 Mass. 161, 163, cert. denied, 525 U.S. 1007 (1998), quoting *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).[14] The combination of these errors may not have required a new trial had the evidence against the defendant been overwhelming, but this was a close case. Shortly before the killing, the defendant twice called 911 asking the police to come to Ceurvels's apartment. In the first call he stated that he was being threatened, and in the second call he stated that Quiles was threatening to kill him. In the second call, the defendant additionally said that Quiles was "flipping out," and Ceurvels's testimony corroborated that, even prior to the 911 calls, Quiles was greatly agitated by his inability to locate a large bag of heroin that he had brought to the apartment the previous evening. Nobody other than the defendant and the victim saw how the deadly struggle commenced, who first grabbed the kitchen knife, or how the fatal blow occurred.

Further, although the defendant during his interrogation admitted to being a "big guy," he was twenty-three years older than the victim, was receiving Social Security disability payments, and, according to Ceurvels's testimony, walked with a cane on multiple occasions. Finally, the jury did not find the defendant guilty of the more serious charge of voluntary manslaughter but instead convicted him of involuntary manslaughter. In these

---

[14]The defendant argues that we should determine whether the *Adjutant* error was harmless beyond a reasonable doubt because the judge denied him his constitutional right to call a witness. We disagree, because our rule allowing judges to admit *Adjutant* evidence is "a matter of common-law principle," *Adjutant, supra* at 650, and "not constitutionally mandated." *Commonwealth* v. *Pring-Wilson*, 448 Mass. 718, 736 (2007).

circumstances, we conclude that the judge's errors prejudiced the defendant such that a new trial is warranted.[15]

3. *Private opinion evidence of the defendant's character.* In this case, the defendant moved in limine to allow him to submit Ceurvels's opinion evidence of the defendant's nonviolent character. In his offer of proof, the defendant proffered that Ceurvels would testify that "he always knew [the defendant] to be quiet, nonviolent, 'laid back' and mellow," and that he had "never known [the defendant] to get angry or raise his voice." The judge denied the defendant's motion. The defendant argues on appeal that, in light of our decision in *Adjutant*, we should revisit our common-law rule that allows a criminal defendant charged with a violent crime to offer evidence of his general reputation for nonviolence in his community or at his workplace, but not evidence of a witness's private opinion of the defendant's nonviolent nature. See *Commonwealth* v. *Walker*, 442 Mass. 185, 198-199 (2004) ("defendant in a criminal case may present evidence of a good reputation with respect to the elements of the crime charged," but not "evidence in the form of private opinions . . . . Personal opinions, without more, simply cannot substantiate a defendant's good character"); Mass. G. Evid. § 405(a) & note (2013) ("Unlike Federal law, general reputation cannot be proven by evidence of personal opinions

---

[15]Because we vacate the defendant's conviction and remand the case for a new trial, we do not consider whether the judge's failure to instruct the jury on the defense of accident in these circumstances also warrants a new trial. However, as guidance for the case on remand, we note that our Model Jury Instructions on Homicide 38, 55 (2013), only require that an instruction on the defense of accident be given in the context of murder in the first or second degree, as negating the "element of intent to kill the victim." In the context of involuntary manslaughter where the Commonwealth alleges that the defendant committed an affirmative act that was wanton and reckless, our model instruction defining wanton and reckless conduct as "intentional conduct that created a high degree of likelihood that substantial harm will result to another person," *id.* at 74, sufficiently instructs a jury that, in order to return a verdict of guilty, they must find that the Commonwealth proved beyond a reasonable doubt both that "[t]he defendant intended the conduct that caused the death" and that the defendant engaged in "conduct that create[d] a high degree of likelihood that substantial harm [would] result to another." *Id.* at 75-76. Although a judge, in her discretion, is free to supplement this instruction by clarifying that an accidental or negligent act would not constitute wanton or reckless conduct, no such instruction is required.

or isolated acts"). Because this issue is fully briefed and may arise on remand, we briefly address the defendant's argument.

In *Adjutant, supra* at 664, we addressed the admissibility of both reputation and private opinion evidence "in the context of establishing who was the first aggressor." There, we noted that "[w]e do not allow the admission of the private opinions of individual witnesses as character evidence"; and we concluded that because "[j]uries should have the ability to draw their own inferences in assessing the bearing of the victim's prior violent conduct on the probability that he was the first aggressor," "we favor the admission of concrete and relevant evidence of specific acts over more general evidence of the victim's reputation for violence." *Id.* at 664-665. Because we declared in *Adjutant* that private opinion evidence is not admissible "in the context of establishing who was the first aggressor," *id.* at 664, we need not revisit our common-law rule in light of *Adjutant.* Ceurvels's personal opinion of the defendant's nonviolent character is not admissible at a new trial.[16]

*Conclusion.* We vacate the defendant's conviction of involuntary manslaughter and remand the case for a new trial.

*So ordered.*

---

[16]While opinion evidence of a defendant's nonviolent nature is inadmissible, we do not address whether, in cases where the identity of the first aggressor is in dispute, a defendant could permissibly offer evidence of a defendant's nonviolent nature by showing specific instances where the defendant acted nonviolently under circumstances where most persons would have resorted to violence.